**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br><br>LAQUESHA GEORGE and MEGAN MCCLENDON,<br><br>Plaintiffs,<br><br>v.<br><br>PROGRESS SOFTWARE CORPORATION and COMMONSPIRIT HEALTH,<br><br>Defendants. | MDL No. 1:23-md-03083-ADB-PGL<br><br>DIRECT FILED COMPLAINT [& JURY DEMAND] PURSUANT TO ORDER REGARDING DIRECT FILING<br><br>CIVIL ACTION NO. |

Plaintiffs Laquesha George and Megan McClendon ("Plaintiffs"), individually and on behalf of all others similarly situated, hereby file this Class Against Complaint against Defendants CommonSpirit Health ("CommonSpirit") and Progress Software Corporation ("Progress") (collectively, "Defendants). The following allegations are based upon personal knowledge with respect to Plaintiffs' own acts, upon the investigation of their counsel, and upon information and belief as to all other matters:

## INTRODUCTION

1. This Complaint is being directly filed into this MDL proceeding Pursuant to the Court's MDL Order No. 12.

2. Plaintiffs bring this Class Action Complaint against Defendants on behalf of themselves and all other similarly situated individuals, stemming from a data breach impacting millions of people who had their highly sensitive personally identifiable information ("PII")—

including, but not limited to, their full names, dates of birth, and Social Security numbers—and protected health information ("PHI," and together with PII, "Private Information") accessed, compromised, and obtained by malicious, unauthorized third parties from Defendants' systems as early as May 27, 2023[1] (the "Data Breach").

3. Defendants tout the safety and security of their services and systems on their websites, particularly their data privacy practices, but failed to adhere to those promises and, instead, allowed the Data Breach to occur.

4. For instance, Progress states: "The security of our customers' environments is paramount. Progress has a comprehensive cybersecurity program in place which includes a zerotrust cybersecurity architecture approach, compliance audits and verifications, source-code scanning, external penetration tests, third-party deep-dive code assessments as well as ongoing coordination with some of the industry's top cybersecurity researchers."[2]

5. Likewise, as alleged in greater detail below, CommonSpirit makes similar statements to consumers that the Personal Information that they entrust to CommonSpirit will remain safe and secure.

6. At the center of the Data Breach, and all Plaintiffs' claims herein, is Progress's on premises secure file transfer software, MOVEit Transfer

---

[1] MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362), Progress: Community (June 16, 2023), https://community.progress.com/s/article/MOVEit-Transfer-CriticalVulnerability-31May2023; Nader Zaveri et al., Zero-Day Vulnerability in MOVEit Transfer Exploited for Data Theft, Mandiant: Blog (Apr. 3, 2024), https://www.mandiant.com/resources/ blog/zero-day-moveit-data-theft.

[2] Progress Trust Center, Progress: MOVEit, https://www.progress.com/security (last visited Dec. 1, 2025).

7. MOVEit Transfer is part of Progress's MOVEit suite of products, originally developed by Progress's wholly-owned subsidiary, Ipswitch, Inc. ("Ipswitch"), which Progress acquired in 2019.[3]

8. MOVEit Transfer is a managed file transfer software used by thousands of companies all around the world.

9. Progress's website further assures MOVEit users that it has substantial data privacy protections and practices in place to keep sensitive Private Information secure. For example:

> Progress MOVEit helps your organization meet cybersecurity compliance standards such as PCI-DSS, HIPAA, GDPR, SOC2 and more. Provide a more secure environment for your most sensitive files, while supporting the reliability of core business processes.
>
> * * *
>
> The security of our customers' environments is paramount. Progress has a comprehensive cybersecurity program in place which includes a zero-trust cybersecurity architecture approach, compliance audits and verifications, source-code scanning, external penetration tests, third-party deep-dive code assessments as well as ongoing coordination with some of the industry's top cybersecurity researchers
>
> When vulnerabilities are found, we work quickly to mitigate the risk, issue appropriate patches and communicate directly with our customers, so they can take immediate action to harden their environments against those vulnerabilities.[4]

10. MOVEit Transfer is software that is licensed to customers on a subscription basis and installed by customers on their own servers, providing the customers with the ability to store,

---

[3] Larry Dignan, Progress acquires Ipswitch for $225 million, tops first quarter targets, ZDNet (Mar. 28, 2019), https://www.zdnet.com/article/progress-acquires-ipswitch-for-225-million-tops-first-quarter-targets/; Progress Completes Acquisition of Ipswitch, Inc., Progress: Press Release (May 1, 2019), https://investors.progress.com/news-releases/news-release-details/progress-completes-acquisition-ipswitch-inc#.

[4] Progress Trust Center, Progress: MOVEit, https://www.progress.com/security (last visited Dec. 1, 2025).

send, and receive sensitive files.[5] MOVEit Transfer is typically accessed by each customer's users through a public-facing web portal that is run on the customer's servers, not Progress's servers.[6]

11. Progress claims MOVEit Transfer encrypts files both in transit and at rest so they cannot be viewed at any time without the appropriate encryption key.[7]

12. In addition to Progress, CommonSpirit is a vendor who contracted with a third party (Welltok, Inc.) which in turn uses MOVEit Transfer.

13. Progress's website states that "in some cases, end users of our customers may need to provide Sensitive [Private] Information to our customer in order to make use of an application that uses our Product or SaaS Product and that Sensitive Personal Information may be stored or processed by us as a result. We process such Sensitive [Private] Information in the role of a processor on behalf of a customer (and/or its affiliates) who is the responsible controller of the Sensitive [Private] Information concerned."[8]

14. On or around May 31, 2023, Progress discovered a vulnerability in MOVEit Transfer that "could lead to escalated privileges and potential unauthorized access." On or about that same day, Progress purportedly notified all of its customers that used MOVEit (such as Welltok), and developed and released a security patch for the vulnerability used in the Data

---

[5] More Secure Managed File Transfer Software for the Enterprise, Progress: MOVEit, https://www.progress.com/moveit/moveit-transfer (last visited Dec. 1, 2025).
[6] Advanced Topics: Systems Internal – URL Crafting, MOVEit Transfer 2023.1 Adm'r Guide, Progress: Prod. Documentation (Apr. 21, 2022), https://docs.progress.com/bundle/moveit-transfer-web-admin-help-2023/page/System-Internals-URL-Crafting.html.
[7] Introduction, MOVEit Transfer 2023.1 Adm'r Guide, Progress: Prod. Documentation (Apr. 21, 2022), https://docs.progress.com/bundle/moveit-transfer-web-admin-help-2023/page/Introduction.html.
[8] https://www.progress.com/legal/privacy-policy.

Breach.[9] The vulnerability was given a severity rating under the Common Vulnerability Scoring System of 9.8 out of 10, signifying that the vulnerability is near the highest level of severity, or "critical."[10] As described below, Progress continued to find additional security vulnerabilities in the MOVEit Transfer software as well as its other products. Progress maintains, publicly and in statements before this Court, that no sensitive data was taken from MOVEit Transfer customers who used Progress's cloud-based systems. Plaintiffs do not allege herein otherwise at this time.

15. On or around May 27, 2023, the Russian cybercriminal ransomware gang Cl0p exploited MOVEit Transfer's vulnerabilities by simultaneously deploying malware to public facing MOVEit Transfer web portals of thousands of MOVEit Transfer customers, decrypting the stored data, and downloading it in bulk.[11]

16. Because the MOVEit Transfer software was not designed to discover or defend against this type of attack, it initially went undetected.[12] Further, because MOVEit Transfer is installed on each customer's servers, there could be no coordinated effort to stop the attack until Progress published a patch.[13]

17. Cl0p's coordinated attack provided it with unfettered access to unencrypted Private Information of millions of individuals.

[9] MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362), Progress: Community (June 16, 2023), https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023.

[10] NIST, Progress MOVEit Transfer SQL Injection Vulnerability (CVE-2023-34362) Detail, Nat'l Vulnerability Database (June 23, 2023), https://nvd.nist.gov/vuln/detail/CVE-2023-34362.

[11] Nader Zaveri et al., Zero-Day Vulnerability in MOVEit Transfer Exploited for Data Theft, Mandiant: Blog (Apr. 3, 2024), https://www.mandiant.com/resources/blog/zero-day-moveit-data-theft.

[12] *Id*.

[13] Joe Slowik, Move It on Over: Reflecting on the MOVEit Exploitation, Huntress: Blog (Jul. 7, 2023), https://www.huntress.com/blog/move-it-on-over-reflecting-on-the-moveit-exploitation.

18. On June 6, 2023, after the Data Breach was publicized and a patch was rolled out, Cl0p claimed credit for the Data Breach and threatened to post stolen data online unless the compromised organizations paid a ransom.[14]

19. When the deadline expired, Cl0p proceeded to publish terabytes of stolen data on the dark web.[15]

20. By December 20, 2023, over 2,600 organizations—accounting for at least 85 million individual victims—had been compromised in the Data Breach.[16]

21. Despite the immediate notification of Progress's customers about the Data Breach, individual victims, including Plaintiffs, were not notified that their Private Information was compromised until months later.

22. The Private Information of millions of individuals compromised in the Data Breach continues to be circulated on the dark web and leveraged by cybercriminals. In one example, a person or group known as Nam3L3ss has sought to download, clean, and organize all data stolen in the Data Breach to make it easily accessible to cybercriminals, and has already done so with millions of records from dozens of organizations so far.[17]Accordingly, Plaintiffs and individual victims of the Data Breach will continue to be victimized as information obtained from the Data

---

[14] Nader Zaveri et al., Zero-Day Vulnerability in MOVEit Transfer Exploited for Data Theft, Mandiant: Blog (Apr. 3, 2024), https://www.mandiant.com/resources/blog/zero-day-moveit-data-theft.

[15] Riam Kim-Mcleod, Clop Leaks: First Wave of Victims Named, ReliaQuest: Blog (July 28, 2023), 10:00 AM), https://www.reliaquest.com/blog/clop-leaks-first-victims/.

[16] Bert Kondruss, MOVEit hack victim list, Kon Briefing, https://konbriefing.com/en-topics/cyber-attacks-moveit-victim-list.html (last updated Dec. 20, 2023).

[17] Ernestas Naprys, MOVEit fallout: hackers leak employee data from Amazon, MetLife, HSBC, and other major companies, cybernews (Nov. 11, 2024, 4:09 PM), https://cybernews.com/security/moveit-fallout-hackers-leak-employee-data-from-amazon-metlife/; Ionut Arghire, 760,000 Employee Records from Several Major Firms Leaked Online, SecurityWeek (Dec. 3, 2024), https://www.securityweek.com/760000-employee-records-from-several-major-firms-leaked-online/.

Breach will continue to proliferate on the dark web.[18] And as more information continues to be disclosed by cybercriminals, fraud and attempted fraud and identity theft will continue to occur for millions more individuals.

23. Defendants were responsible for the collection, storage, and protection of Plaintiffs' and Class Members' Private Information. Defendants owed duties to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Private Information against unauthorized access and disclosure. Defendants breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the Private Information entrusted to them from unauthorized access and disclosure, failing to ensure that third-party software followed industry standards for data security, and failing to ensure that third-party vendors used software that followed industry standards for data security, thereby allowing the Data Breach to occur.

24. As a result of Defendants' inadequate data security and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs' and Class Members' Private Information was accessed by, and disclosed to, unauthorized and malicious third-party actors. This instant action seeks to remedy Defendants' failings and their consequences. Plaintiffs thus bring this Complaint on behalf of themselves and all similarly situated individuals whose Private Information was exposed as a result of the Data Breach, which Progress publicly disclosed on May 31, 2023.

[18] Alex Scroxton, More data stolen in 2023 MOVEit attacks comes to light, ComputerWeekly.com (Nov. 12, 2024, 4:10 PM), https://www.computerweekly.com/news/366615522/More-data-stolen-in-2023-MOVEit-attacks-comes-to-light. ("Kevin Robertson, chief operating officer at Acumen Cyber, said: "This leak shows how data makes its way across the dark web, often reappearing in the news long after breaches took place and often in the hands of other attackers.").

## PARTIES

25. Plaintiff Laquesha George ("Plaintiff George") is a resident and citizen of the state of Nebraska and resides in Omaha, Nebraska.

26. Plaintiff George is a current patient at CHI – NE ("CHI") a subsidiary of CommonSpirit. Upon information and belief, CommonSpirit contracted with Welltok on behalf of CHI to "operate[] an online contract-management platform that enables healthcare clients to provide patients and members with important notices and communications for CHI Health - NE and received your information in connection with these services."

27. Plaintiff George received a Notice Letter by U.S. mail addressed to her directly from Welltok, writing on behalf of CHI, dated December 1, 2023. According to the Notice Letter, Plaintiff George's Private Information was improperly accessed and obtained by unauthorized third parties, which may have included her "name and [sic] name, address, date of birth, some clinical information, patient ID, and health insurance information."

28. Plaintiff George's Notice Letter states that:

> **What Happened.** On July 26, 2023, we were alerted to an earlier alleged compromise of our MOVEit Transfer server in connection with software vulnerabilities made public by the developer of the MOVEit Transfer tool. We had previously installed all published patches and security upgrades immediately upon such patches being made available by Progress Software, the maker of the MOVEit Transfer tool and conducted an examination of our systems and networks using all information available to determine the potential impact of the published vulnerabilities' presence on the MOVEit Transfer server and the security of data housed on the server and confirmed that there was no indication of any compromise at that time.
>
> Upon being alerted to the alleged issue, we moved quickly to launch an additional investigation with the assistance of third-party cybersecurity specialists and using additional information that had been discovered in the intervening period, to determine the potential for a hidden presence of vulnerabilities' on the MOVEit Transfer server and the security of data housed on the server. After a full reconstruction of our systems and historical data, our investigation determined on August 11, 2023 that an unknown actor exploited software vulnerabilities, accessed the MOVEit Transfer server on May 30, 2023, and exfiltrated certain data from the

> MOVEit Transfer server during that time. We subsequently undertook a time-consuming and detailed reconstruction and review of the data stored on the server at the time of this incident to understand the contents of that data and to whom that data relates. Subsequently, we have learned that data related to you was present on the impacted server at the time of the event.

29. At the time that Progress discovered the Data Breach—on or around May 31, 2023—Welltok, CommonSpirit, and CHI were in possession of and/or had stored Plaintiff George's Private Information but failed to protect it and, instead allowed cybercriminal to access it through the Data Breach. As Plaintiff George's Notice Letter acknowledges, after a "review of the data stored on the server at the time of this incident to understand the contents of that data and to whom that data relates[,]" Welltok "learned that data related to you was present on the impacted server at the time of the event."

30. CommonSpirit also failed to timely and adequately notify Plaintiff George about the Data Breach. Although the Notice Letter disclosed that Welltok had been "alerted to an earlier alleged compromise of our MOVEit Transfer server in connection with software vulnerabilities made public by the developer of the MOVEit Transfer tool," on July 26, 2023, it took Welltok, CommonSpirit, and CHI over four months to notify Plaintiff George of the Data Breach's occurrence.

31. In addition to its substantial delay in notifying Plaintiff George of the Data Breach, CommonSpirit also put the burden on Plaintiff George to prevent any further harm resulting from the Data Breach by not disclosing the specific Private Information of Plaintiff George that was compromised or the specific actions taken by CommonSpirit in response to the Data Breach.

32. Instead, Plaintiff George's Notice Letter simply identified categories of Plaintiff George's Private Information that may or may not have been compromised by the Data Breach,

stating that, "[t]he following types of information may have been impacted: name and [sic] name, address, date of birth, some clinical information, patient ID, and health insurance information."

33. Plaintiff George's Notice Letter further stated vaguely that "we are reviewing and enhancing our existing policies and procedures related to data privacy to reduce the likelihood of a similar future event." The Notice Letter also advised Plaintiff George in general terms "to remain vigilant against incidents of identity theft and fraud by regularly reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

34. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff George who retains a vested interest in ensuring that her Private Information remains protected.

35. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff George of the Data Breach's critical facts. Without these details, Plaintiff George's ability to mitigate the harms resulting from the Data Breach is severely diminished.

36. Plaintiff George's Private Information compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. Since the Data Breach, Plaintiff George started receiving repeated telephone calls and voicemail messages from an unknown person(s) calling from an unknown phone number demanding that Plaintiff George confirm her identity by proving her Private Information. These calls and voicemail have recently become more threatening in nature, as the caller has threatened to physically come to Plaintiff George's home if she does not provide her Private Information to him over the phone. These calls continued into at minimum October 2024.

37. In addition, since the Data Breach, Plaintiff George has experienced other forms of spam and phishing emails, texts, and phone calls on a daily basis. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

38. As a direct and proximate result of the Data Breach, Plaintiff George has spent substantial time and effort on, among other things: investigating and handling the frequent spam and phishing calls and voicemails she receives and the threats made in connection with those calls; checking the accuracy of other spam and phishing emails, texts, and phone calls she receives; checking credit reports, bank accounts, and credit card statements; and investigating and researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter.

39. Plaintiff George greatly values her privacy and her Private Information and takes reasonable steps to maintain the confidentiality of her Private Information including, among other things, maintaining strong passwords, using multi-factor authentication for sensitive accounts, regularly reviewing financial and other important account activity, promptly investigating any alerts about login attempts or suspicious activity, avoiding transactions with businesses she does not trust, storing important documents in a safe place, shredding sensitive documents, and making sure that she has not shared her Social Security number publicly or directly to any unknown or untrusted individuals or entities.

40. Despite these efforts, Plaintiff George is very concerned about fraud and identity theft, as well as the consequences of such fraud and identity theft, resulting from the Data Breach. Specifically, the Data Breach has caused Plaintiff George to fear for her personal financial security and the personal safety of her and her family due to the harassing and threatening phishing calls she receives demanding that she provides her Private Information. Plaintiff George has also suffered a frequent sleep disruption from late night checking bank and credit card statements for fraudulent activity and dealing with late night spam calls she receives. Plaintiff George further fears that someone will use her Private Information or steal her identity since her Private Information was compromised. The Data Breach has caused Plaintiff George daily stress, anxiety, anger, and fear.

41. Plaintiff George anticipates spending additional considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach, especially since she continues to be harassed with spam and phishing attempts. In addition, Plaintiff George will continue to be at present and continued increased risk of identity theft and fraud for years to come.

42. Plaintiff George has a continuing interest in ensuring that her Private Information, which remains in CommonSpirit's possession, is protected and safeguarded from future disclosure and/or data breaches.

43. As a result of the Data Breach, Plaintiff George has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of her stolen Private Information, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity;

loss in value of her personal data; lost property in the form of her compromised Private Information; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff George now faces a substantial risk that unauthorized third parties will further misuse her Private Information because (1) the Data Breach involved a single cybercriminal organization, CL0P, specifically targeting Defendants' systems; (2) the dataset of Private Information that CL0P exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Private Information CL0P exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff George's name. As a result of the Data Breach, Plaintiff George has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen Private Information such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her Private Information and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time that she spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

44. Plaintiff George experienced all of the foregoing harm and injury as a direct result of Progress's and CommonSpirit's actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff George would compensate her for the foregoing redressable injuries. Further, Plaintiff George seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Progress and CommonSpirit to take steps to monitor for,

protect, and/or prevent misuse of her Private Information accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

45. Plaintiff Megan McClendon ("Plaintiff McClendon") is a resident and citizen of the state of Washington and resides in Lakewood, Washington.

46. Plaintiff McClendon is a current patient at Virginia Mason Franciscan Health ("Virginia Mason") a subsidiary of CommonSpirit. Upon information and belief, CommonSpirit contracted with Welltok on behalf of Virginia Mason to "operate[] an online contract-management platform that enables healthcare clients to provide patients and members with important notices and communications for Virginia Mason Franciscan Health and received your information in connection with these services."

47. Plaintiff McClendon received a Notice Letter by U.S. mail addressed to her directly from Welltok, writing on behalf of Virginia Mason, dated December 1, 2023. According to the Notice Letter, Plaintiff McClendon's Private Information was improperly accessed and obtained by unauthorized third parties, which may have included her "name, address, date of birth, some clinical information, patient ID, and health insurance information."

48. Plaintiff McClendon's Notice Letter states that:

> **What Happened.** On July 26, 2023, we were alerted to an earlier alleged compromise of our MOVEit Transfer server in connection with software vulnerabilities made public by the developer of the MOVEit Transfer tool. We had previously installed all published patches and security upgrades immediately upon such patches being made available by Progress Software, the maker of the MOVEit Transfer tool and conducted an examination of our systems and networks using all information available to determine the potential impact of the published vulnerabilities' presence on the MOVEit Transfer server and the security of data housed on the server and confirmed that there was no indication of any compromise at that time.
>
> Upon being alerted to the alleged issue, we moved quickly to launch an additional investigation with the assistance of third-party cybersecurity specialists and using

> additional information that had been discovered in the intervening period, to determine the potential for a hidden presence of vulnerabilities' on the MOVEit Transfer server and the security of data housed on the server. After a full reconstruction of our systems and historical data, our investigation determined on August 11, 2023 that an unknown actor exploited software vulnerabilities, accessed the MOVEit Transfer server on May 30, 2023, and exfiltrated certain data from the MOVEit Transfer server during that time. We subsequently undertook a time-consuming and detailed reconstruction and review of the data stored on the server at the time of this incident to understand the contents of that data and to whom that data relates. Subsequently, we have learned that data related to you was present on the impacted server at the time of the event.

49. At the time that Progress discovered the Data Breach—on or around May 31, 2023—Welltok, CommonSpirit, and Virginia Mason were in possession and/or had stored Plaintiff McClendon's Private Information but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach. As Plaintiff McClendon's Notice Letter acknowledges, after a "review of the data stored on the server at the time of this incident to understand the contents of that data and to whom that data relates[,]" Welltok "learned that data related to you was present on the impacted server at the time of the event."

50. CommonSpirit also failed to timely and adequately notify Plaintiff McClendon about the Data Breach. Although the Notice Letter disclosed that Welltok had been "alerted to an earlier alleged compromise of our MOVEit Transfer server in connection with software vulnerabilities made public by the developer of the MOVEit Transfer tool," on July 26, 2023, it took Welltok, CommonSpirit and Virginia Mason over four months to notify Plaintiff McClendon of the Data Breach's occurrence.

51. In addition to its substantial delay in notifying Plaintiff McClendon of the Data Breach, CommonSpirit also put the burden on Plaintiff McClendon to prevent any further harm resulting from the Data Breach by not disclosing the specific Private Information of Plaintiff

McClendon that was compromised or the specific actions taken by CommonSpirit in response to the Data Breach.

52. Instead, Plaintiff McClendon's Notice Letter simply identified categories of Plaintiff McClendon's Private Information that may or may not have been compromised by the Data Breach, stating that, "[t]he following types of information may have been impacted: name, address, date of birth, some clinical information, patient ID, and health insurance information."

53. Plaintiff McClendon's Notice Letter further stated vaguely that "we are reviewing and enhancing our existing policies and procedures related to data privacy to reduce the likelihood of a similar future event." The Notice Letter also advised Plaintiff McClendon in general terms "to remain vigilant against incidents of identity theft and fraud by regularly reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

54. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff McClendon who retains a vested interest in ensuring that her Private Information remains protected.

55. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff McClendon of the Data Breach's critical facts. Without these details, Plaintiff McClendon's ability to mitigate the harms resulting from the Data Breach is severely diminished.

56. Plaintiff McClendon's Private Information compromised in the Data Breach has already been circulated on the Dark Web. Indeed, Plaintiff McClendon has received several notifications from IDNotify in 2024, most recently on September 23, 2024, reporting that her Private Information was found on the Dark Web.

57. In addition, since the Data Breach, Plaintiff McClendon has experienced other forms of spam and phishing emails, texts, and phone calls on a daily basis. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

58. As a result of the Data Breach, Plaintiff McClendon pays $100 annually in out-of-pocket costs for credit monitoring services with IDNotify.

59. As a direct and proximate result of the Data Breach, Plaintiff McClendon has spent substantial time and effort on, among other things: investigating and handling the frequent spam and phishing emails, texts, and calls she receives; checking credit reports, bank accounts, and credit card statements; and investigating, researching, and verifying the legitimacy of the Data Breach upon receiving the Notice Letter.

60. Plaintiff McClendon greatly values her privacy and her Private Information and takes reasonable steps to maintain the confidentiality of her Private Information including, among other things, using credit monitoring services for which she pays an annual fee, maintaining strong passwords and not using the same password for more than one account, using multi-factor authentication for sensitive accounts, regularly reviewing financial and other important account activity, promptly investigating any alerts about login attempts or suspicious activity, avoiding transactions with businesses she does not trust, storing important documents in a safe place,

keeping important/sensitive documents locked up for safe keeping, and making sure that she has not shared her Social Security number publicly or directly to any unknown or untrusted individuals or entities.

61. Despite these efforts, Plaintiff McClendon is very concerned about fraud and identity theft, as well as the consequences of such fraud and identity theft, resulting from the Data Breach. Specifically, she suffers daily stress and anxiety and fears what Private Information of hers is on the Dark Web and how it might be used to engage in fraudulent activity and identity theft and to damage her credit. Plaintiff McClendon is angry over CommonSpirit not adequately safeguarding her Private Information. In addition, Plaintiff McClendon has suffered from sleep disruption and frequent nightmares from stressing over what Private Information of hers is in the hands of criminals and what they could do with that Private Information. This stress, anxiety, and sleep disruption has recently caused Plaintiff McClendon to experience stress-related hair loss.

62. Plaintiff McClendon anticipates spending additional considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff McClendon will continue to be at present and continued increased risk of identity theft and fraud for years to come.

63. Plaintiff McClendon has a continuing interest in ensuring that her Private Information, which remains in CommonSpirit's possession, is protected and safeguarded from future disclosure and/or data breaches.

64. As a result of the Data Breach, Plaintiff McClendon has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of her stolen Private Information, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent

scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised Private Information; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff McClendon now faces a substantial risk that unauthorized third parties will further misuse her Private Information because (1) the Data Breach involved a single cybercriminal organization, CL0P, specifically targeting Defendants' systems; (2) the dataset of Private Information that CL0P exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Private Information CL0P exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff McClendon's name. As a result of the Data Breach, Plaintiff McClendon has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen Private Information such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her Private Information and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time that she spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

65. Plaintiff McClendon experienced all of the foregoing harm and injury as a direct result of Progress's and CommonSpirit's actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff McClendon would compensate her for the foregoing redressable injuries. Further, Plaintiff McClendon seeks injunctive relief to redress the foregoing

injuries and harm, including, but not limited to, requiring Progress and CommonSpirit to take steps to monitor for, protect, and/or prevent misuse of her Private Information accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

66. Defendant Progress Software Corporation is a public corporation organized under the laws of the State of Delaware with its principal place of business located at 15 Wayside Road, Suite 400, Burlington, Massachusetts 01803.

67. Progress produces software for creating and deploying business applications. Founded in 1981 in Burlington, Massachusetts, it has offices in 16 countries, thousands of employees, and revenues of over $500 million.[19]

68. Originally called Data Language Corporation, the company changed its name to Progress Software in 1987. In 2016, Progress Software re-branded to "Progress" in an effort to "shed any doubts it was not living up to its name."[20]

69. Progress has seen rapid expansion over the past two decades, acquiring eXcelon Corporation for approximately $24 million in 2002,[21] DataDirect Technologies in 2003 for $88

---

[19] SEC Filing Details, Progress Software Corporation (Nov. 30, 2021, filed Jan. 27, 2022), https://investors.progress.com/sec-filings/sec-filing/10-k/0000876167-22-000038.
[20] Justine Hofherr, After 35 years, Progress Software introduces a new name and vision, Bulletin Bostin (Nov. 8, 2016), https://www.builtinboston.com/articles/after-35-years-progress-software-introduces-new-name-and-vision.
[21] Scarlet Pruitt, Progress buys XML toolmaker eXcelon, Computerworld (Oct. 21, 2002), https://www.computerworld.com/article/1336237/progress-buys-xml-tool-maker-excelon.html.

million,[22] Persistence Software in 2004 for $16 million,[23] and at least a dozen other companies for well over $200 million since then.[24]

70. Progress's insatiable appetite for growth also resulted in its 2019 acquisition of Ipswitch, Inc., an IT management vendor known for its MOVEit managed file transfer platform, for $225 million.[25]

71. Progress's insatiable appetite for growth also resulted in its 2019 acquisition of Ipswitch, Inc., an IT management vendor known for its MOVEit managed file transfer platform, for $225 million.

72. Defendant CommonSpirit Health is a non-profit corporation organized under the laws of Colorado with its principal place of business located at 444 W. Lake St, STE 2500, Chicago, Illinois 60606.

73. CommonSpirit was formed in 2019 by the merger of Dignity Health and Catholic Health Systems.

---

[22] Brian Fonseca, Progress Software Acquires DataDirect, eWeek (Dec. 8, 2003), https://www.eweek.com/database/progress-software-acquires-datadirect/.

[23] Waters Technology Staff, Progress to Acquire Persistence for $16M, WatersTechnology (Oct. 4, 2004), https://www.waterstechnology.com/sell-side-technology/news/1632464/progress-acquire-persistence-usd16m.

[24] See, e.g., Andrew Phelan, Trinity boys sell college firm for $162m, Irish Independent (June 26, 2008), https://www.independent.ie/regionals/herald/trinity-boys-sell-college-firm-for-162m/27876930.html; Darryl K. Taft, Progress Software Acquires Iona, eWeek (June 25, 2008), https://www.eweek.com/development/progress-software-acquires-iona/; Progress Software acquires algorithmic technology vendor Apama, Finextra (Apr. 7, 2005), https://www.finextra.com/newsarticle/13477/progress-software-acquires-algorithmic-technology-vendor-apama; Yogesh Gupta, Progress to Acquire NoSQL Database Pioneer, MarkLogic, Progress Blogs (Jan. 3, 2023), https://www.progress.com/blogs/progress-to-acquire-nosql-database-pioneer-marklogic.

[25] Larry Dignan, Progress acquires Ipswitch for $225 million, tops first quarter targets, ZDNet (Mar. 28, 2019), https://www.zdnet.com/article/progress-acquires-ipswitch-for-225-million-tops-first-quarter-targets/; Progress Completes Acquisition of Ipswitch, Inc., Progress: Press Release (May 1, 2019), https://investors.progress.com/news-releases/news-release-details/progress-completes-acquisition-ipswitch-inc#.

74. CommonSpirit is the largest Catholic hospital chain and second-largest nonprofit chain in the United States, operating more than 2,200 care sites and 138 hospitals across 24 states.[26]

## JURISDICTION AND VENUE

75. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

76. Absent the Court's MDL Order No. 12 (Direct Filing Order), Plaintiffs could have filed their action directly in this District, as their claims arise, in part, from the actions and inactions of Progress described below. This action could also have been filed in the Northern District of Illinois as Plaintiffs' claims also arise, in part, from the actions and inactions of CommonSpirit described below. The Northern District of Illinois has personal jurisdiction over Defendant CommonSpirit because it maintains its principal place of business in the District and CommonSpirit is authorized to conduct business in that District, making it subject to general personal jurisdiction in Illinois. Additionally, the Northern District of Illinois has personal jurisdiction over Defendant Progress because Progress has committed acts within the District that give rise to this action, and has established minimum contacts with this forum such that the exercise of jurisdiction over Progress aligns with traditional notions of fair play and substantial justice.

77. The Northern District of Illinois is the proper venue for this case pursuant to 18 U.S.C. § 1391(b)(1) because Defendant CommonSpirit's principal place of business is located in

[26] https://www.commonspirit.org/about-us#:~:text=CommonSpirit%20Health%20is%20a%20health%20care%20system,Inclusion%20*%20Integrity%20*%20Excellence%20*%20Collaboration; https://www.commonspirit.careers/#:~:text=Leading%20in%20humankindness%20across%20the,care%20centers%20serving%2024%20states.

the District; and pursuant to 18 U.S.C. § 1391(b)(2) because a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

## FACTUAL BACKGROUND

78. Plaintiffs incorporate the allegations contained in the Plaintiffs' Omnibus Set of Additional Pleading Facts (ECF No. 908) in its entirety.

79. Plaintiffs incorporate the allegations contained in "Chapter One: Factual Allegations Concerning All Defendants" of Plaintiffs' Corrected Bellwether Consolidated Class Action Complaint (ECF No. 1543).

### A. Progress and the Services It Provides.

80. Plaintiffs incorporate the factual allegations contained in Chapter Two: Factual Allegations and Causes of Action as Against Progress" (¶¶ 1325–1385) of Plaintiffs' Corrected Bellwether Consolidated Class Action Complaint (ECF No. 1543).

81. Plaintiffs' Omnibus Set of Additional Pleading Facts along with Chapters One and Two of the Corrected Bellwether Consolidated Class Action Complaint set out the nature of Progress's business and its data security failings that lead to the Data Breach.

### B. CommonSpirit and the Services It Provides

82. CommonSpirit was founded in 2019 following the merger of Dignity Health and Catholic Health Initiatives, forming one of the largest non-profit health systems in the United States.

83. CommonSpirit owns and operates 2,200 care sites and 138 hospitals across 24 states. CommonSpirit is organized into five operating regions—California Central South, Mountain, and Northwest. These regions group CommonSpirit's care sites and hospitals.

84. All CommonSpirit's hospitals, such as CHI and Virginia Mason, participate in CommonSpirit's Organized Health Care Arrangement, so each subsidiary can share health information with CommonSpirit for "treatment, payment, and joint health operations activities." These joint operations include "quality improvement, risk management, financial and billing services, and health information exchanges."

85. Upon information and belief, CommonSpirit therefore provides an integrated/unified information technology platform for each of its hospitals.

86. At all relevant times, CommonSpirit knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if the Personal Information of Plaintiffs and Class Members transmitted via MOVEit Transfer was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

87. As a condition to obtaining healthcare services and/or health plan services, from CommonSpirit and its subsidiaries (such as CHI and Virginia Mason), Plaintiffs and Class Members were required to give their sensitive and confidential Private Information, either directly or indirectly, to CommonSpirit who contracted with Welltok. This information included, at a minimum, Plaintiffs' and Class Members' names, dates of birth, addresses, health information, Social Security Numbers, Medicare / Medicaid IDs, and health insurance information.

88. Unbeknownst to Plaintiffs and Class Members, CommonSpirit and its subsidiaries (such as CHI and Virginia Mason) in turn, provided Welltok with access to that Private Information, directly or indirectly, to collect, store, and transfer using Welltok's platform that utilized MOVEit Transfer.

89. By obtaining, collecting, storing, and sharing Plaintiffs' and Class Members' Private Information, CommonSpirt assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

90. CommonSpirit made explicit promises to Plaintiffs and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information, maintaining a list of HIPAA Notices of Privacy Practices on its website for each of its subsidiaries, including Virginia Mason and CHI.[27] Each subsidiary's HIPAA Notices of Privacy Practices are template in nature, representing that the Notices apply to "all CommonSpirit Health members, including hospitals, clinics, home health agencies, outpatient services, mobile units, hospice agencies, skilled nursing facilities, etc."

91. For example, CHI's Notice of Privacy Practices, which describes "how medical information about you may be used and disclosed and how you can get access to this information," makes the following pledge:

> We understand that your protected health information is private and personal. We are committed to protecting it. Hospitals, clinics, doctors, home health and hospice staff, and other staff members make a record each time you visit. This notice applies to all the records of your care at the facility, whether created by staff members or your doctor. [28]

92. CHI's Notice further represents that, "[w]e will protect your protected health information as much as we can under the law. Sometimes state law gives more protection to your

[27] HIPAA Notice of Privacy Practices, CommonSpirit, https://www.commonspirit.org/legal-and-privacy-notices/hipaa-notice-of-privacy-practices#accordion-9fd90ace97-item-c106f32fd0 (last visited Dec. 1, 2025).

[28] *See Notice of Privacy Practices*, CHI Health (last updated Oct. 2020), https://www.chihealth.com/content/dam/chihealthcom/documents/patients-and-visitors/patient-notice-of-privacy-practices/privacy_english.pdf.

information than federal law. Sometimes federal law gives more protection than state law. In each case, we will apply the laws that protect your information the most."[29]

93. CHI assures members that CHI will not use or disclose their Private Information for any reasons not explicitly listed in the Notice (such as for medical treatment, health-care operations, research, and instances required by law) "unless we get your written permission. Under HIPAA, this permission is called an "authorization."[30]

94. Similarly, Virginia Mason's Notice of Privacy Practices, which describes "how medical information about you may be used and disclosed and how you can get access to this information," makes the following pledge:

> We understand that your protected health information is private and personal. We are committed to protecting it. Hospitals, clinics, doctors, home health and hospice staff, and other staff members make a record each time you visit. This notice applies to all the records of your care at the facility, whether created by staff members or your doctor.[31]

95. That Notice further represents that, "[w]e will protect your protected health information as much as we can under the law. Sometimes state law gives more protection to your information than federal law. Sometimes federal law gives more protection than state law. In each case, we will apply the laws that protect your information the most."[32]

96. Virginia Mason assures members that it will not use or disclose their Private Information for any reasons not explicitly listed in the Notice (such as for medical treatment, health

---

[29] *Id.*
[30] *Id.*
[31] *Notice of Privacy Practices*, Virginia Mason Franciscan Health (June 2022), https://www.vmfh.org/content/dam/vmfhorg/pdf/vmfh-npp-english.pdf.
[32] *Id.*

care operations, research, and instances required by law) "unless we get your written permission. Under HIPAA, this permission is called an 'authorization.'"[33]

**C. CommonSpirit Contracts with Welltok for Patient Engagement Services**

97. Welltok is a data-driven SaaS company that provides a consumer activation platform for the healthcare industry. Welltok's platform allows health plans, employers, healthcare providers, and public entities to connect with their consumers with personalized health improvement resources.[34]

98. A consumer activation platform helps health plans, employers, healthcare providers, and public entities to incentivize consumer actions, such as getting a vaccine, scheduling a doctor's appointment, or selecting health insurance coverage. To incentivize consumer actions, an activation platform uses large datasets of consumer data, predictive analytics, and multi-channel communications to engage with consumers in a personalized manner.[35]

99. As part of providing this activation platform and related services to its clients, such as CommonSpirit, Welltok uses MOVEit Transfer for transferring large datasets, including the transfer of Plaintiffs' and Class Members' Private Information, via Welltok's MOVEit server.

100. Upon information and belief, CommonSpirit, on behalf of its subsidiaries (such as CHI and Virginia Mason), contracts with Welltok for patient engagement services. More specifically, CommonSpirit contracts with Welltok to operate an online contract-management platform that enables healthcare clients to provide patients and members with important notices and communications for its subsidiaries, including Virginia Mason and CHI.

---

[33] *Id.*
[34] *See Welltok*, https://www.welltok.com/ (last accessed Dec. 1, 2025).
[35] *What is a Consumer Activation Platform?*, Personify Health, https://personifyhealth.com/resources/what-is-a-consumer-activation-platform/ (last visited Dec. 1, 2025).

**D. CommonSpirit Knew the Risks of Collecting Private Information**

101. CommonSpirit was, or should have been, fully aware of the unique type and the significant volume of data it collected from its patients, members, and consumers, and therefore was or should have been aware of the significant number of individuals who would be harmed by the compromise and theft of their decrypted data.

102. Because of the highly sensitive and personal nature of the Private Information CommonsSpirit solicits, acquires, stores, and maintains with respect to patients, customers, and/or users and other individuals, CommonSpirit, upon information and belief, promised to, among other things: keep Private Information private; comply with industry standards related to data security and Private Information, including FTC guidelines; inform consumers of their legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to the products and services Plaintiffs and Class Members obtain from CommonSpirit and its subsidiaries; and provide adequate notice to individuals if their Private Information is disclosed without authorization. As a sophisticated business entity handling highly sensitive and confidential consumer data, CommonSpirit's data security obligations were particularly important, especially in light of the substantial increase in cyberattacks and data breaches in industries handling significant amounts of Private Information preceding the date of the MOVEit Data Breach.

103. At all relevant times, CommonSpirit knew, or should have known, that Plaintiffs' and Class Members' Private Information was a target for malicious actors.

104. Despite such knowledge, CommonSpirit implemented inadequate data privacy and security measures to that were insufficient to protect Plaintiffs' and Class Members' Private Information from cyberattacks, including, but not limited to, inadequately vetting, auditing,

monitoring, testing, and patching of the software applications they used to store and transfer such data and/or adequately vetting, auditing, or monitoring the applications and security protocols of vendors that CommonSpirit contracted with.

105. In light of recent high profile data breaches—including breaches arising from previously exploited vulnerabilities in other file transfer applications (e.g., Accellion FTA, Fortra GoAnywhere MFT)— CommonSpirit knew or should have known that its electronic records and consumers' Private Information would be targeted by cybercriminals and ransomware attack groups.

106. "Third-party software security risks are on the rise, and so are the significant cyberattacks they facilitate. According to a CrowdStrike report, 45% of surveyed organizations said they experienced at least on software supply chain attack in 2021."[36] Indeed, a recent study found that the healthcare industry "was the worst affected industry with the highest volume of third-party breaches," with the vendors experiencing the most breaches being those that provided software, IT products, and related services.[37]

107. Recent high profile cybersecurity incidents at healthcare partner and provider companies, including NextGen Healthcare, Inc. (1.5 million patients, April 2024), OneTouchPoint, Inc. (4.1 million patients, July 2022), Shields Healthcare Group (2 million patients, March 2022), Blackbaud, Inc. (millions of individuals, May 2020), American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020),

---

[36] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (last updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.

[37] Steve Alder, *Healthcare Experiences More Third-Party Data Breaches Than Any Other Sector*, (Mar. 4, 2024), https://www.hipaajournal.com/healthcare-highest-third-party-breaches/.

Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), put Welltok Bellwether Defendants on notice that their electronic records would be targeted by cybercriminals.

108. Because of the value of the type of data the medical industry collects and stores, the medical industry is a prime target for threat actors and has experienced disproportionally higher numbers of data theft events than other industries. Between 2009 and 2023, 5,887 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights. Those breaches have resulted in the exposure of 519,935,970 healthcare records, a number that equates to 1.5x the population of the United States.[38]

109. According to the HIPAA Journal's 2023 Healthcare Data Breach Report, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[39]

110. In light of recent high profile data breaches at other health care partner and provider companies, CommonSpirit knew or should have known that its electronic records and consumers' Private Information would be targeted by cybercriminals and ransomware attack groups.

111. The breadth of the data exfiltrated from Welltok's MOVEit server in the Data Breach makes the information particularly valuable to cybercriminals and identity thieves, leaving

---

[38] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/, (last visited Dec. 1, 2025).

[39] Steve Adler, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (Jan. 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

Plaintiffs and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

112. Social Security numbers (such as those compromised in the Data Breach) are among the worst kinds of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. Indeed, unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot easily be replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

113. The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other Private Information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[40]

114. The Social Security Administration also warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies)

---

[40] *Identity Theft and Your Social Security Number*, Social Security Administration (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

> likely will have records under your old number. Along with other Private Information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other Private Information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[41]

115. Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of Private Information to steal and then sell.

116. Medical information (such as that compromised in the Data Breach) is also highly valuable to cybercriminals. As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[42] A complete identity theft kit that includes health insurance

---

[41] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[42] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[43]

117. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[44]

118. As highly sophisticated parties that handle sensitive Private Information, CommonSpirit failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' Private Information.

119. The ramifications of CommonSpirit's failures to keep Plaintiffs' and Class Members' Private Information secure are severe and long-lasting. To avoid detection, identity

---

[43] *Managing Cyber Risks in an Interconnected World, Key Findings from the Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/ee/et/publications/pub/the-global-state-of-information-security-survey-2015.pdf .

[44] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data can be sold in small batches to multiple buyers as opposed to in bulk to a single buyer. Thus, Plaintiffs and Class Members must vigilantly monitor their accounts, and Plaintiffs and Class Members are at an increased risk of fraud and identity theft, for many years into the future.

120. Thus, CommonSpirit knew, or should have known, the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if its systems were breached. CommonSpirit, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring or from mitigating the consequences of the Data Breach.

**E. The Data Breach.**

121. Upon information and belief, CommonSpirit contracts with Welltok to operate an online contract-management platform that enables CommonSpirit and subsidiaries (such as CHI and Virginia Mason) to provide patients and members with important notices and communications.

122. As part of providing these services, CommonSpirit and its subsidiaries, exchange Plaintiffs' and Class Members' Private Information with Welltok via MOVEit Transfer.

123. Beginning on or about May 27, 2023, the notorious CL0P ransomware gang exploited a vulnerability in MOVEit Transfer and accessed, copied, and stole Plaintiffs' and Class Members' PII and PHI, including information that CommonSpirit (and its subsidiaries) transferred to Welltok and that was stored on Welltok's MOVEit server. The vulnerability allowed CL0P to escalate user privileges and gain unauthorized access to customer environments.[45]

[45] Matt Kapko, *MOVEit Mass Exploit Timeline: How the File-Transfer Services Attacks Entangled Victims*, Cybersecurity Dive (Sept. 25, 2023), https://www.cybersecuritydive.com/news/moveit-breach-timeline/687417/.

124. Despite the Data Breach occurring in May 2023, Plaintiffs and Class Members were not mailed notice of the Data Breach until December 1, 2023.

125. Upon information and belief, the Data Breach impacted hundreds of thousands of CommonSpirit patients.

**F. CommonSpirit Failed to Implement Adequate Data Security Measures**

126. CommonSpirit knew, or should have known, the importance of safeguarding the Private Information entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on affected individuals as a result of a data breach.

127. CommonSpirit therefore owed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate data security measures to secure, protect, and safeguard the Private Information entrusted to them by Plaintiffs and Class Members.

128. CommonSpirit breached its duties to Plaintiffs and Class Members by, among other things, failing to employ adequate vendor screening and vetting, including of Welltok, Progress and its MOVEit Transfer application.

129. CommonSpirit knew or should have known that Progress: employed poorly-written, outdated, and insecure code in its MOVEit Transfer application; failed to update outdated code; and failed to check for known or newly discovered vulnerabilities.

130. CommonSpirit who contracted with Welltok should have but did not vet Progress or its MOVEit Transfer application, and as a result, failed to prevent or detect the Data Breach.

131. CommonSpirit who contracted with Welltok failed to ensure Progress employed and maintained adequate cybersecurity measures to prevent the Data Breach from occurring.

132. CommonSpirit also had obligations arising under the FTC Act, HIPAA, industry standards, common law, and their own promises and representations made to Plaintiffs and Class Members to keep their Private Information confidential and protected from unauthorized access and disclosure.

***CommonSpirit Failed to Comply with FTC Guidelines***

133. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

134. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[46]

135. The FTC guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and, have a response plan ready in the event of a breach.[47]

136. The FTC further recommends that companies not maintain PII longer than necessary for authorization of a transaction, limit access to sensitive data, require complex

---

[46] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[47] *Id.*

passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

137. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act" or FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

138. Upon information and belief, CommonSpirit failed to properly implement the foregoing recommended data security practices.

139. CommonSpirit's failure to employ reasonable and appropriate measures to protect against unauthorized access to the Private Information in their care and failure to employ reasonable and appropriate oversight of vendors to whom they entrusted Private Information in their care constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

140. CommonSpirit was at all times fully aware of its obligations to protect the Private Information entrusted to it. CommonSpirit was also aware of the significant repercussions that would result from its failure to do so.

***CommonSpirit Violated its HIPAA Obligations***

141. Because CommonSpirit, maintains, and handles PHI, CommonSpirit is either (1) a healthcare service provider handling medical patient data and/or providing services to hospitals and healthcare organizations that are covered entities under HIPAA pursuant to 45 C.F.R. §

160.103, or (2) business associates of healthcare service providers pursuant to 45 C.F.R. § 160.103. As such, CommonSpirit is a covered entity required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

142. HIPAA requires covered entities and business associates to protect against reasonably anticipated threats to the security of sensitive patient health information.

143. CommonSpirit is also subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921; 45 C.F.R. § 160.103.

144. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form.

145. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

146. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

147. Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media," "[m]aintained in electronic media," or "[t]ransmitted or maintained in any other form or medium."

148. Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."

149. HIPAA required CommonSpirit to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.

150. HIPAA also requires covered entities and business associates to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, covered entities and business associates are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

151. HIPAA and HITECH also obligate covered entities and business associates to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are

reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. § 17902.

152. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires covered entities and business associates to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 calendar days after discovery of a breach***." (emphasis added).

153. The Data Breach, as it related to CommonSpirit, is considered a breach under the HIPAA Rules because it involved an access of PHI not permitted under the HIPAA Privacy Rule.

154. A breach under the HIPAA Rules is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. § 164.40.

155. The Data Breach resulted from a combination of insufficiencies that demonstrate CommonSpirit failed to comply with safeguards mandated by HIPAA regulations.

156. As a HIPAA covered entity, CommonSpirit is required to implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured PHI, as in the case of the Data Breach.

157. As a HIPAA-covered entity handling medical patient data, CommonSpirit's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the date of the Data Breach.

***CommonSpirit Failed to Comply with Industry Standards***

158. Several best practices have been identified that at a minimum should be implemented by entities, like CommonSpirit, that handle highly sensitive and confidential Private Information.

159. These best practices include, but are not limited to: educating all employees about data security practices and procedures; requiring strong passwords; implementing multi-layer security—including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; adequately securing encryption keys to prevent unauthorized access; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

160. Other standard cybersecurity practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

161. On information and belief, CommonSpirit failed to meet the minimum standards of any of the following frameworks: the U.S. National Institute of Standards and Technology (NIST) Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

162. On information and belief, CommonSpirit failed to meet Health and Human Services' recommendations that covered entities, such as CommonSpirit, should implement to protect against some of the more common, and often successful, cyber-attack techniques:

a. Regulated entities should implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

b. Regulated entities should implement technologies that examine and verify that received emails do not originate from known malicious site, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

c. Regulated entities should mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

d. Regulated entities should implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

e. Regulated entities should implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[48]

163. These foregoing frameworks are existing and applicable industry standards, and CommonSpirit failed to comply with these accepted standards, thereby opening the door to CL0P and causing the Data Breach.

164. CommonSpirit's unlawful conduct therefore includes, but is not limited to, the following acts and/or omissions:

a. Implementing inadequate data security system that did not adequately protect against the risk of data breaches and cyberattacks;

[48] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S Dep't. of Health & Human Services (last updated Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

b. Inadequately protecting Plaintiffs', clients', patients', and employees' Private Information;

c. Inadequately monitoring its own data security systems for existing intrusions;

d. Inadequately training its employees and vendors regarding the proper handling of Plaintiffs', clients', patients', and employees' Private Information;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f. Failing to adhere to HIPAA guidelines and industry standards for cybersecurity as discussed above; and,

g. Otherwise breaching its duties and obligations to Plaintiff's and Class Members' Private Information.

165. CommonSpirit instituted inadequate security controls and/or failed to institute the security controls that would have prevented the Data Breach, including those above, and affirmatively mishandled the maintenance, storage, and transfer of the Private Information in which CommonSpirit was entrusted, leading to the Data Breach.

166. CommonSpirit affirmatively breached its obligations and duties to Plaintiffs and Class Members and/or was otherwise negligent because it mismanaged its data security systems, policies, and procedures, failing to adequately safeguard Plaintiffs' and Class Members' Private Information.

### G. Had CommonSpirit Complied with Applicable Security Standards, It Would Have Determined that MOVEit Transfer was Not Safe to Use and Prevented the Data Breach.

167. CommonSpirit is responsible for protecting the Private Information it solicits and collects from attacks and breaches that result from weaknesses in third-party systems and software.

168. CommonSpirit failed to safeguard the Plaintiffs' and Class Members' Private Information when it failed to adopt and enforce reasonable and available data security practices and procedures to prevent and/or mitigate the known risk of a cyberattack.

169. Prior to the Data Breach, CommonSpirit should have, but did not, implement and maintain reasonable and necessary data security policies and procedures, which would have mitigated or avoided the Data Breach.

170. There are numerous known and available steps that the CommonSpirit could have taken to mitigate or even prevent the Data Breach.

171. Data security practices that could and should have been implemented by the CommonSpirit to prevent the MOVEit Data Breach include:

a. Vetting and periodic auditing of third-party vendors, including Welltok and Progress;

b. Auditing of third-party software, including the MOVEit Transfer software; and

c. Employing supply chain security.

172. Each of these three measures—and CommonSpirit's failure to utilize them—are explained in greater detail below:

***Auditing Third-Party Vendors and Software***

173. Security audits of third-party vendors and third-party software enable companies to identify vulnerabilities, monitor access to sensitive data, and discover and remediate any unauthorized data access.[49]

---

[49] *6 Security Tips for Third Party Software*, Cybersecurity Insiders, https://web.archive.org/web/20250327225733/https://www.%E2%80%8Ccybersecurity-insiders.com/6-security-tips-for-third-party-software/(archived Mar. 27, 2025).

174. CommonSpirit should have but did not properly vet or audit its third-party vendors, including Welltok.

175. CommonSpirit knew or should have known that Welltok used the MOVEit Transfer software to transfer and/or store its customers' and patients' Private Information.

176. Security auditing of Welltok and the MOVEit Transfer software could have prevented the Data Breach as to CommonSpirit.

177. The methods for conducting security audits of third-party vendors and software are well-known and widely available.[50]

178. CommonSpirit therefore could and should have employed companies that conduct security audits of third-party vendors and third-party software.[51]

***Vetting Vendors***

179. CommonSpirit could have prevented the Data Breach by engaging in the standard industry practice of vetting vendors—such as Welltok—that it transferred highly sensitive Private Information to. Had CommonSpirit done so, it would have discovered the vulnerability used by C10p and prevented the Data Breach. CommonSpirit failed to do so.

180. Vendor risk assessments or security questionnaires are "one of the best methods for extracting deep cybersecurity insights about any aspects of a vendor's attack surface."[52] Industry-

[50] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly),* UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.
[51] Davit Asatryan, *Third-Party Applications Audit: Complete Guide*, Spin.ai (Nov. 4, 2021, updated Apr. 19, 2024), https://spinbackup.com/blog/third-party-applications-audit/.
[52] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software ("Risk assessments can either be framework-based to identify security control deficiencies against popular security standards or custom-designed for focused investigations about specific third-party risks.").

standard risk assessments and security questionnaires designed to help companies discover vulnerabilities in third-party web applications and software are widely available,[53] and can be used to assess the security of third-party software against common attack vectors, including SQL injection susceptibility.[54] Proper vetting and routine audits of vendors' data security practices, including vetting of Welltok's and Progress's cybersecurity practices, could have prevented the Data Breach. Welltok and CommonSpirit chose to use the MOVEit software (or to allow the MOVEit software to be used) to transfer sensitive information despite its security flaws, and failed to take the simple, industry-standard step of vetting the MOVEit service before using it to transfer pieces of highly sensitive Private Information.

181. Further, by failing to take the various steps alleged above (including thoroughly vetting the MOVEit software), CommonSpirit enriched itself by saving the costs it reasonably should have expended on adequate data security measures to secure the Plaintiffs' and Class Members' Private Information.

182. Instead of providing a reasonable level of security that would have prevented the Data Breach, CommonSpirit instead calculated to avoid its data security obligations at the expense of the Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs Class Members, on the other hand, suffered as a direct and proximate result of the CommonSpirit's failures to provide the requisite security.

## **CLASS ACTION ALLEGATIONS**

183. Plaintiffs bring the causes of action listed below on behalf of themselves and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), as representatives of the following proposed CommonSpirt Nationwide Class:

---

[53] *Id.*
[54] *Id.*

> CommonSpirit Nationwide Class: All persons whose Private Information was compromised in the MOVEit Data Breach which such information was obtained from or hosted by CommonSpirit.

184. Plaintiff George brings the causes of action listed below on behalf of herself and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), as representative of the following proposed subclass:

> CommonSpirit Nebraska Class: All residents of Nebraska whose Private Information was compromised in the MOVEit Data Breach which such information was obtained from or hosted by CommonSpirit.

185. Plaintiff McClendon brings the causes of action listed below on behalf of herself and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), as representative of the following proposed subclass:

> CommonSpirit Washington Class: All residents of Washington whose Private Information was compromised in the MOVEit Data Breach which such information was obtained from or hosted by CommonSpirit.

186. Excluded from the above Class and Subclasses are: (1) the judges presiding over the action; (2) Progress and CommonSpirit, their subsidiaries, parent companies, successors, predecessors, and any entity in which Progress and CommonSpirit or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly opt out; and (4) the successors or assigns of any such excluded persons.

187. Plaintiffs reserve the right to, after conducting discovery, modify, expand, or amend the above class definitions or to seek certification of classes or subclasses defined differently than above before any court determines whether certification is appropriate.

188. Numerosity: Class Members are so numerous that their individual joinder is impracticable, as the proposed Classes are comprised of thousands if not millions of members who are geographically dispersed. The exact size of the Classes and the identities of the individual

members are identifiable through the Defendants' records, including, but not limited to, the files implicated in the MOVEit Data Breach.

189. Typicality: Plaintiffs' claims are typical of the claims of the Class Members' claims. The claims of Plaintiffs are based on the same legal theories and arise from the same failure by Defendants to safeguard their Private Information that was compromised in the MOVEit Data Breach.

190. Adequacy: Plaintiffs are adequate representatives of the Classes because Plaintiffs are each a member of the Classes they seek to represent and are committed to pursuing this matter Defendants on behalf of themselves and the Class Members. Plaintiffs have no conflicts of interest with the Class Members. Plaintiffs have also retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations.

191. Commonality and Predominance: The following questions of law and fact are common to all Class Members and predominate over any potential questions affecting individual Class Members:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure;

b. Whether the Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' Private Information;

c. Whether the Defendants breached their duties to protect Plaintiffs' and Class Members' Private Information;

d. Whether the Defendants violated the statutes alleged herein; and

e. Whether Plaintiffs' and all other Class Members are entitled to damages and the measure of such damages and relief.

192. Superiority: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiffs' and Class Members' claims. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class Members individually to effectively redress the Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

193. Injunctive Relief Also Appropriate: Consistent with Fed. R. Civ. P. 23(b)(2), Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole.

## CAUSES OF ACTION AGAINST PROGRESS

194. Plaintiffs are Bellwether Plaintiffs who have previously asserted Claims for Relief against Progress in Plaintiffs' Corrected Bellwether Consolidated Class Action Complaint. The Court has issued Rulings on Progress's 12(b)(6) motion to Plaintiffs' Corrected Bellwether Consolidated Class Action Complaint. Plaintiffs therefore incorporate and re-plead the following Claims for Relief against Progress that they previously pled, and the Court permitted to proceed.

For clarify, Plaintiffs will utilize the same Claims for Relief Numbers as set forth in Plaintiffs' Corrected Bellwether Consolidated Class Action Complaint:

**FIRST CAUSE OF ACTION AGAINST PROGRESS**
**Negligence**

195. Plaintiffs re-allege and incorporate by reference paragraphs 1-194 above.

196. Plaintiffs bring this claim against Progress on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

197. Entities using Progress's MOVEit software require their customers to submit non-public Private Information as a condition of becoming a customer and receiving services.

198. Through its relationships with these entities, Progress facilitated the transfer and storage of the Private Information of Plaintiffs and Class Members as part of its business, which affects commerce.

199. As customers of entities using Progress's MOVEit software, Plaintiffs and Class Members, or their service providers, continue to send these entities new Private Information as they continue to receive services or conduct business with these entities.

200. Plaintiffs and Class Members entrusted entities using Progress's MOVEit software with their Private Information with the reasonable understanding that their highly personal Private Information would be safeguarded and protected against unauthorized disclosure.

201. Progress had full knowledge of the high monetary value and sensitivity of Plaintiffs' and Class Members' Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information was wrongfully disclosed.

202. By assuming the responsibility to facilitate the transfer and storage of this data through its MOVEit software, in order to derive business value and commercial profits, Progress assumed a duty under common law to Plaintiffs and Class Members to exercise reasonable care to

ensure that its MOVEit software would secure and safeguard their Private Information and keep it from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

203. Progress owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, as well as its MOVEit software, and the personnel responsible for them, adequately protected the Private Information.

204. Progress's duty to use reasonable care arose from several sources, including, but not limited to, those described below.

205. Progress holds itself out as a trusted provider of secure file-transfer software. Its duty to develop software that included reasonable security measures arose as a result of the special relationship that existed between Progress, on the one hand, and Plaintiffs and Class Members, through their relationship with users of MOVEit software, on the other hand. That special relationship arose because of Progress's business as the developer of MOVEit, which required Plaintiffs and Class Members to provide and entrust users of MOVEit software with their confidential Private Information, who in turn relied on Progress's MOVEit software to transfer and store that data securely.

206. Thus, Progress was in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

207. Progress owed a duty to Plaintiffs and Class Members to develop and maintain a software file transfer service that employed reasonable data security measures to protect the Private Information its customers collected, stored, and used on its MOVEit software.

208. The risk that unauthorized persons would attempt to gain access to Plaintiffs' and Class Members' Private Information and misuse was foreseeable to Progress. It had a common law

duty to prevent foreseeable harm to others because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Progress. By selling software whose function is collecting, receiving, storing, and using Private Information that is routinely targeted by criminals for unauthorized access, Progress was obligated to act with reasonable care to protect against these foreseeable threats.

209. Given that Progress's MOVEit software enables Progress's customers to collect, store, and use vast amounts of Private Information and the high market value of this data, it was inevitable that unauthorized cybercriminals would at some point try to hack into the software or Progress's computer networks. Progress knew, or should have known, the importance of exercising reasonable care in developing, monitoring, managing, and updating its software.

210. Because Progress's business pertains to Private Information, Progress's Privacy Policies acknowledge its legal obligations under HIPAA as well as its duty to protect and prevent from disclosure all other data collected and stored on its MOVEit software.

211. In addition, under negligence *per se* doctrine in Illinois, Massachusetts, Nebraska, and Washington,[*] Progress had duties arising under HIPAA, the HIPAA Privacy Rule and Security Rule, HITECH, and the FTC Act, because Plaintiffs and Class Members are consumers within the class of persons that HIPAA, HITECH, and Section 5 of the FTC Act were intended to protect, and the harms that have occurred are the types of harm HIPAA, HITECH, and the FTC Act were intended to guard against. Specifically:

a. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair

[*] The Court granted Plaintiffs leave to amend this allegation for these states only. *See* ECF No. 1516 at 29.

act or practice by businesses, such as Progress, of failing to use reasonable measures to protect sensitive consumer data, including Private Information. Various FTC publications and orders promulgated pursuant to the FTC Act also form the basis of Progress's duty; and

b. Many entities that use MOVEit are "covered entities" under HIPAA, and Progress is a "business associate." As a business associate, Progress owed legal obligations to implement administrative, technical, and physical safeguards. 42 U.S.C. § 17931 (applying security requirements to business associates and incorporating security requirements into BAAs between business associates and covered entities); *see also* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards); 42 U.S.C. § 17902.

212. Progress had a duty to promptly and adequately notify Plaintiffs and Class Members about the Data Breach, but failed to do so, and breached this duty.

213. Progress had and continues to have duties to adequately disclose that Plaintiffs' and Class Members' Private Information might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was and continues to be necessary to allow Plaintiffs and the Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

214. Progress breached its duties owed to Plaintiffs and Class Members and thus was negligent. Progress breached these duties by, among other things: (a) mismanaging its software development and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of its MOVEit transfer software, which resulted in the

unauthorized access and compromise of Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to detect the breach at the time it began or within a reasonable time thereafter; and (f) failing to follow its own policies and practices published to its clients.

215. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach and harms suffered.

216. Progress's negligent conduct is ongoing, in that Plaintiffs' and Class Members' Private Information remains stored on Progress's MOVEit software in an unsafe and insecure manner.

217. Plaintiffs and Class Members are entitled to injunctive relief requiring Progress to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**SECOND CAUSE OF ACTION AGAINST PROGRESS**
**Negligence *per se***

218. Plaintiffs re-allege and incorporate by reference paragraphs 1-194 above.

219. Plaintiffs bring this claim against Progress on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

220. Progress had duties arising under HIPAA, the HIPAA Privacy Rule and Security Rule, HITECH, and the FTC Act to protect Plaintiffs' and Class Members' Private Information.

221. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice

by businesses, such as Progress, of failing to use reasonable measures to protect sensitive consumer data, including Private Information.

222. Various FTC publications and orders promulgated pursuant to the FTC Act also form the basis of Progress's duty.

223. Progress breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to implement fair, reasonable, or appropriate computer systems and data security practices that complied with applicable industry standards to safeguard Plaintiffs' and Class Members' Private Information as part of its business practices.

224. Many entities that use MOVEit are "covered entities" under HIPAA, and Progress is a "business associate."

225. As a business associate, Progress owed legal obligations to implement administrative, technical, and physical safeguards. 42 U.S.C. § 17931 (applying security requirements to business associates and incorporating security requirements into BAAs between business associates and covered entities); *see also* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards); 42 U.S.C. § 17902.[55]

226. Progress's specific negligent acts and omissions, resulting in failure to comply with HIPAA and HITECH regulations include, but are not limited to, the following: (i) failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information; (ii) failing to adequately monitor the security of its MOVEit software; (iii) allowing unauthorized access Class Members' Private Information; (iv) failing to detect in a timely manner

[55] *HITECH Act Summary*, HIPAA Survival Guide, https://perma.cc/HSQ6-4942 (last accessed Nov. 27, 2024).

that Class Members' Private Information had been compromised; and (v) failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

227. Progress's violations of HIPAA, the HIPAA Privacy Rule and Security Rule, HITECH, and Section 5 of the FTC Act (and similar state statutes) independently constitute negligence *per se*.

228. Plaintiffs and Class Members are consumers within the class of persons that HIPAA, HITECH, and Section 5 of the FTC Act were intended to protect.

229. The harms that have occurred are the types of harm HIPAA, HITECH, and the FTC Act were intended to guard against.

230. The FTC has pursued enforcement actions against businesses and healthcare entities that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harms as those suffered by Plaintiffs and the Class.

231. In addition, under various state data security and consumer protection statutes such as those outlined herein, Progress had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' Private Information.

232. Progress's conduct was particularly unreasonable given the nature and amount of Private Information that its MOVEit software transferred and stored, the high frequency of cyber-attacks that target the exact type of Private Information targeted here, and the foreseeable consequences of a data breach of that nature.

233. Plaintiffs and Class Members were foreseeable victims of Progress's violations of HIPAA, HITECH, and the FTC Act, and state data security and consumer protection statutes. Progress knew or should have known that its failure to implement reasonable data security

measures to protect and safeguard Plaintiffs' and Class Members' Private Information would cause damage to Plaintiffs and the Class.

234. Plaintiffs and Class Members were foreseeable victims of Progress's negligent acts and omissions. Progress knew or should have known that its failure to implement reasonable data security measures to protect and safeguard information transferred and stored on the MOVEit platform, i.e., Plaintiffs' and Class Members' Private Information, would cause damage to Plaintiffs and the Class.

235. Progress violated its own policies by failing to maintain the confidentiality of Plaintiffs' and Class Members' records; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI, and ultimately disclosing Plaintiffs' and Class Members' PHI.

236. Progress violated its Business Associate Agreements ("BAA") with covered entities, under which it agreed to protect PHI, including the PHI of Plaintiffs and Class Members, and under which it was subject to privacy and security safeguard requirements and standards established by HIPAA, HITECH, and the Omnibus Rule.

237. But for Progress's violations of the applicable laws and regulations, Plaintiffs' and Class Members' Private Information would not have been accessed by unauthorized parties.

238. As a direct and proximate result of Progress's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer injuries, including, but not limited to: (i) theft of their Private Information; (ii) costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts; (iii) costs associated with purchasing credit monitoring and identity theft protection services; (iv) lowered credit scores resulting from credit inquiries following fraudulent activities; (v) costs associated with time spent and the loss of

productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Progress's Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts; (vi) the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals; (vii) damages to and diminution in value of their Private Information entrusted indirectly to Progress with the mutual understanding that it would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; (viii) continued and certainly increased risk of exposure to hackers and thieves of their Private Information, and additional unauthorized viewing of their Private Information that was already hacked in the Data Breach; (ix) loss of their privacy and confidentiality in their Private Information; (x) loss of personal time and opportunity costs to monitor and/or remedy harms caused by theft of their Private Information; (xi); an increase in spam calls, texts, and/or emails; and (xii) the continued and certainly increased risk to their Private Information.

239. As a direct and proximate result of Progress's negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

240. Finally, as a direct and proximate result of Progress's negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains on Progress's MOVEit software and is subject to further unauthorized

disclosures so long as Progress fail to undertake appropriate and adequate measures to protect the Private Information via improved security measures.

**THIRD CAUSE OF ACTION AGAINST PROGRESS**
**Breach of Third-Party Beneficiary Contract**

241. Plaintiffs re-allege and incorporate by reference paragraphs 1-194 above.

242. Plaintiffs bring this claim against Progress on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

243. Upon information and belief, Progress entered into contracts with various direct users, vendors, vendor contracting entities, and vendor contracting entity customers to provide secure file transfer services, servers, and/or related equipment and services that included access to and use of the MOVEit software, data security practices, procedures, and protocols related to the MOVEit software sufficient to safeguard the Plaintiffs' and Class Members' Private Information that was entrusted to these various entities.

244. Upon information and belief, contracts between Progress and its direct or indirect customers were made expressly for the benefit of the individuals whose data was transferred and stored on MOVEit software as a result of those contracts, as Progress sold its MOVEit software to enable its customers to receive, store, utilize, transfer, and protect those individuals' Private Information, so that Progress's customers could directly or indirectly provide them with goods and services. Thus, the benefit of collection, use, and protection of the Private Information belonging to Plaintiffs and Class Members was the direct and primary objective of the contracting parties, and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

245. Progress and its direct or indirect customers knew or should have known that if they were to breach these contracts, Plaintiffs and Class Members would be harmed.

246. Progress and its direct or indirect customers breached their contracts by, among other things, failing to adequately secure Plaintiffs' and Class Members' Private Information, and, as a result, Plaintiffs and Class Members were harmed.

247. As a direct and proximate result of Progress's and its direct or indirect customers' breach, Plaintiffs and Class Members are at a current and ongoing risk of identity theft, and have already sustained incidental and consequential damages including: (i) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out-of-pocket" costs incurred due to actual identity theft; (iv) loss of time incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing emails; (vi) diminution of value of their Private Information; (vii) future costs of identity theft monitoring; and (viii) the continued risk to their Private Information, which remains in Progress's and its direct or indirect customers' control, and which is subject to further breaches, so long as Progress and its direct or indirect customers fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

248. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

**EIGHTH CAUSE OF ACTION AGAINST PROGRESS**
**Massachusetts General Laws, Chapter 93A**
**M.G.L. ch. 93A §§ 2 and 9**

249. Plaintiffs re-allege and incorporate by reference paragraphs 1-194 above.

250. Plaintiffs bring this claim against Progress on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

251. M.G.L. ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. ch. 93A § 9 permits any consumer injured by a violation of M.G.L. ch. 93A § 2 to bring a civil action, including a class action, for damages and injunctive relief.

252. Plaintiffs allege Progress committed unfair business acts and/or practices in violation of M.G.L. ch. 93A §§ 2 and 9.

253. Progress knew or should have known of the inherent risks in experiencing a data breach if it failed to maintain adequate systems and processes for keeping Plaintiffs' and Class Members' Private Information safe and secure. Only Progress was in a position to ensure that its software and systems were sufficient to protect against harms to Plaintiffs and the Class Members resulting from a data security incident such as the Data Breach; instead, it failed to implement such safeguards.

254. Progress's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information. Progress's misconduct included failing to adopt, implement, and maintain the systems, policies, and procedures necessary to prevent the Data Breach.

255. Progress acknowledges its conduct created actual harm to Plaintiffs and Class Members because Progress instructed them to monitor their accounts for fraudulent conduct and identity theft.

256. Progress knew, or should have known of, the risks inherent in disclosing, collecting, storing, accessing, and transmitting Private Information and the importance of adequate security because of, *inter alia*, the prevalence of data breaches.

257. Progress failed to adopt, implement, and maintain fair, reasonable, or adequate security measures to safeguard Plaintiffs' and Class Members' Private Information, failed to recognize in a timely manner the Data Breach, and failed to notify Plaintiffs and Class Members in a timely manner that their Private Information was accessed in the Data Breach.

258. These acts and practices are unfair in material respects, offend public policy, are immoral, unethical, oppressive and unscrupulous and violate 201 CMR 17.00 and M.G.L. ch. 93A § 2.

259. As a direct and proximate result of Progress's unfair acts and practices, Plaintiffs and Class Members have suffered injury and/or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and/or fraudulent use of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of Progress's Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from unemployment and/or tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk that their Private Information is subject to further unauthorized disclosures so long as Progress fails to undertake appropriate and adequate measures to protect it; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of disclosed Private Information.

260. Neither Plaintiffs nor the other Class Members contributed to Progress's Data Breach.

261. Plaintiffs sent a demand for relief, in writing, to Progress on June 4, 2024, prior to filing this complaint. Multiple Plaintiffs in consolidated actions have sent[56]—or alleged in their complaints that they would send[57]—similar demand letters as required by M.G.L. c. 93A § 9. Plaintiffs have not received a written tender of settlement that is reasonable in relation to the injury actually suffered by Plaintiffs and the Class Members.

262. Based on the foregoing, Plaintiffs and the other Members of the Class are entitled to all remedies available pursuant to M.G.L ch. 93A, including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

263. Pursuant to M.G.L. ch. 231, § 6B, Plaintiffs and other Members of the Class are further entitled to pre-judgment interest as a direct and proximate result of Progress's wrongful

---

[56] *See, e.g.*, *Ghalem, et al. v. Progress Software Corp., et al.*, 23-cv-12300 (D. Mass.), at ECF No. 1, ¶ 213 ("A demand identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered was mailed or delivered to Defendants at least thirty days prior to the filing of a pleading alleging this claim for relief").

[57] In all of the following cases (among others), plaintiffs indicated that they were going to send similar demand letters: *Allen, et al. v. Progress Software Corp*., 23-cv-11984 (D. Mass.); *Anastasio v. Progress Software Corp., et al*., 23-cv-11442 (D. Mass.); *Arden v. Progress Software Corp., et al*., 23-cv-12015 (D. Mass.); *Boaden v. Progress Software Corp., et al*., 23-cv-12192 (D. Mass.); *Brida v. Progress Software Corp., et al*., 23-cv-12202 (D. Mass.); *Casey v. Progress Software Corp., et al*., 23-cv-11864 (D. Mass.); *Constantine v. Progress Software Corp., et al*., 23-cv-12836 (D. Mass.); *Daniels v. Progress Software Corp., et al*., 23-cv-12010 (D. Mass.); *Doe v. Progress Software Corp., et al*., 23-cv-1933 (D. Md.); *Ghalem, et al. v. Progress Software Corp., et al*., 23-cv-12300 (D. Mass.); *Kennedy v. Progress Software Corp., et al*., 23-cv-12275 (D. Mass.); *Kurtz v. Progress Software Corp., et al*., 23-cv-12156 (D. Mass.); *McDaniel, et al. v. Progress Software Corp., et al*., 23-cv-11939 (D. Mass.); *Pilotti-Iulo v. Progress Software Corp., et al*., 23-cv-12157 (D. Mass.); *Pulignani v. Progress Software Corp., et al.* , 23-cv-1912 (D. Md.); *Siflinger, et al. v. Progress Software Corp., et al*., 23-cv-11782 (D. Mass.); *Tenner v. Progress Software Corp*., 23-cv-11412 (D. Mass.); *Truesdale v. Progress Software Corp., et al*., 23-cv-1913 (D. Md.).

conduct. The amount of damages suffered as a result is a sum certain and capable of calculation, and Plaintiffs and Class Members are entitled to interest in an amount according to proof.

**TWENTY-SECOND CAUSE OF ACTION AGAINST PROGRESS**
**Nebraska Consumer Protection Act**
**Neb. Rev. Stat. §§ 59-1601, et seq.**

264. Plaintiffs re-allege and incorporate by reference paragraphs 1-194 above.

265. Plaintiff George brings this claim against Progress on behalf of the CommonSpirit Nebraska State Class ("Nebraska Class Members").

266. Progress is a "person" as defined by Neb. Rev. Stat. § 59-1601(1).

267. Progress advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska, as defined by Neb. Rev. Stat. § 59-1601(2).

268. Progress engaged in unfair and deceptive acts and practices in conducting trade and commerce, in violation of Neb. Rev. Stat. § 59-1602, including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff George's and Nebraska Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that its MOVEit software would protect the privacy and confidentiality of Plaintiff George's and Nebraska Class Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808;

f. Failing to timely and adequately notify the Plaintiff George and Nebraska Class Members of the Data Breach;

g. Omitting, suppressing, and concealing the material fact that its MOVEit software did not reasonably or adequately secure Plaintiff George's and Nebraska Class Members' Private Information; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808.

269. Progress's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Progress's MOVEit software's data security and its ability to protect the confidentiality of consumers' Private Information.

270. As a direct and proximate result of Progress's unfair and deceptive acts and practices, Plaintiff George and Nebraska Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

271. Progress's unfair and deceptive acts and practices complained of herein affected the public interest, including the large number of Nebraskans affected by the Data Breach.

272. Plaintiff George and Nebraska Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, the greater of either (1) actual damages or (2) $1,000, civil penalties, and reasonable attorneys' fees and costs.

**TWENTY-THIRD CAUSE OF ACTION AGAINST PROGRESS**
**Nebraska Uniform Deceptive Trade Practices Act**
**Neb. Rev. Stat. §§ 87-301, *et seq.***

273. Plaintiffs re-allege and incorporate by reference paragraphs 1-188 above.

274. Plaintiff George brings this claim against Progress on behalf of the CommonSpirit Nebraska State Class ("Nebraska Class Members").

275. Progress is a "person" as defined by Neb. Rev. Stat. § 87-301(19).

276. Progress advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska.

277. Progress engaged in unfair and deceptive acts and practices in conducting trade and commerce, in violation of Neb. Rev. Stat. §§ 87-302(a)(5), (8), and (10), including:

a. Representing that goods and services have characteristics, uses, benefits, or qualities that they do not have;

b. Representing that goods and services are of a particular standard, quality, or grade if they are of another; and

c. Advertising its goods and services with intent not to sell them as advertised and in a manner calculated or tending to mislead or deceive.

278. Progress's deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff George's and Nebraska Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that its MOVEit software would protect the privacy and confidentiality of Plaintiff George's and Nebraska Class Members' Private Information, including by Progress implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808;

f. Failing to timely and adequately notify the Plaintiff George and Nebraska Class Members of the Data Breach;

g. Omitting, suppressing, and concealing the material fact that its MOVEit software did not reasonably or adequately secure Plaintiff George's and Nebraska Class Members' Private Information; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808.

279. Progress's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Progress's MOVEit software's data security and its ability to protect the confidentiality of consumers' Private Information.

280. Progress intended to mislead Plaintiff George and Nebraska Class Members and induce them to rely on its misrepresentations and omissions.

281. Had Progress disclosed to Plaintiff George and Nebraska Class Members that its MOVEit software was not secure and, thus, vulnerable to attack, Progress would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Progress marketed and sold its MOVEit software knowing that Progress's direct and indirect clients would depend on it to securely maintain sensitive and valuable Private Information of Plaintiff George and Nebraska Class Members. Progress accepted

the responsibility of protecting this Private Information from unauthorized disclosure while keeping the inadequate state of the MOVEit software's security controls secret from the public. Accordingly, because Progress represented that its MOVEit software would securely maintain their Private Information, Plaintiff George and Nebraska Class Members acted reasonably in relying on Progress's misrepresentations and omissions, the truth of which they could not have discovered.

282. Progress intentionally, knowingly, and maliciously violated Nebraska's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff George's and Nebraska Class Members' rights.

283. As a direct and proximate result of Progress's unfair and deceptive acts and practices, Plaintiff George and Nebraska Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

284. Progress's unfair and deceptive acts and practices complained of herein affected the public interest, including the large number of Nebraskans affected by the Data Breach.

285. Plaintiff George and Nebraska Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, civil penalties, and attorneys' fees and costs.

**THIRTY-SECOND CAUSE OF ACTION AGAINST PROGRESS**
**Washington Consumer Protection Act**
**Wash. Rev. Code §§ 19.86.020, *et seq.***

286. Plaintiffs re-allege and incorporate by reference paragraphs 1-194 above.

287. Plaintiff Megan McClendon brings this claim against Progress on behalf of the CommonSpirit Washington State Class ("Washington Class Members").

288. Progress is a "person" as defined by Wash. Rev. Code Ann. § 19.86.010(1).

289. Progress advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code Ann. § 19.86.010 (2).

290. Progress engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code Ann. § 19.86.020, including:

a. Failing to implement and maintain reasonable security and privacy measures with regard to its MOVEit software in order to protect Plaintiff McClendon's and Washington Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff McClendon's and Washington Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA, 42 U.S.C. § 1320d, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that its MOVEit software would protect the privacy and confidentiality of Plaintiff McClendon's and Washington Class Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff McClendon's and Washington Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, and 42 U.S.C. § 1320d;

f. Failing to timely and adequately notify the Plaintiff McClendon and Washington Class Members of the Data Breach;

g. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff McClendon's and Washington Class Members' Private Information; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff McClendon's and Washington Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA, 42 U.S.C. § 1320d.

291. Progress's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Progress's data security and the ability of Progress's MOVEit software to protect the confidentiality of consumers' Private Information.

292. Progress acted intentionally, knowingly, and maliciously to violate Washington's Consumer Protection Act, and recklessly disregarded Plaintiff McClendon's and Washington Class Members' rights. Progress is of such a sophisticated and large nature that other data breaches and public information regarding security vulnerabilities put it on notice that the security and privacy protections provided by its MOVEit software were inadequate.

293. Progress's conduct is injurious to the public interest because it violates Wash. Rev. Code Ann. § 19.86.020, a statute that contains a specific legislation declaration of public interest impact, and/or injured persons and had and has the capacity to injure persons. Further, its conduct affected the public interest, including the many Washingtonians affected by the Data Breach.

294. As a direct and proximate result of Progress's unfair and deceptive acts and practices, Plaintiff McClendon and Washington Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

295. Plaintiff McClendon and Washington Class Members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

**THIRTY-THIRD CAUSE OF ACTION AGAINST PROGRESS**
**Declaratory Judgment**

296. Plaintiffs re-allege and incorporate by reference paragraphs 1-194 above.

297. Plaintiffs bring this claim against Progress on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

298. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

299. Progress owed a duty of care to Plaintiffs and Class Members, which required it to develop and maintain software that would adequately safeguard Plaintiffs' and Class Members' Private Information.

300. The Private Information belonging to Plaintiffs and Class Members remains on MOVEit software.

301. Upon information and belief, Progress's data security measures on its MOVEit software remain inadequate.

302. Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their Private Information, and the risk remains that further compromises of their Private Information will occur in the future.

303. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Progress owes a legal duty to secure the MOVEit software, and thereby secure Plaintiffs' and Class Members' Private Information under the common law, HIPAA, the FTCA, and other state and federal laws and regulations, as set forth herein;

b. Progress's existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect individuals' Private Information; and

c. Progress continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs' and Class Members' Private Information.

304. This Court should also issue corresponding prospective injunctive relief requiring Progress to employ adequate security protocols consistent with legal and industry standards to protect Class Members' Private Information, as described in the Prayer for Relief.

305. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach of Progress's systems. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable and they will be forced to bring multiple lawsuits to rectify the same conduct.

306. The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Progress if an injunction is issued. Among other things, if another massive data breach occurs at Progress, Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Progress of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Progress has a pre-existing legal obligation to employ such measures.

307. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach of Progress's MOVEit software, thus preventing future injury to Plaintiffs and Class Members whose Private Information would be further compromised.

## CAUSES OF ACTION AGAINST COMMONSPIRIT

### FIRST CAUSE OF ACTION AGAINST COMMONSPIRIT
### Negligence

308. Plaintiffs re-allege and incorporate by reference paragraphs 1-193 above.

309. Plaintiffs bring this claim against CommonSpirit on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

310. CommonSpirit required Plaintiffs and Class Members to entrust CommonSpirit (and its subsidiaries) with their Private Information in order to receive healthcare and/or health plan services. CommonSpirirt collected, stored, and maintained the Private Information of Plaintiffs and Class Members during the course of providing healthcare and/or health plan services.

311. CommonSpirt collected, stored, maintained, and shared Plaintiffs' and Class Members' Private Information with Welltok in connection with the services provided by Welltok to CommonSpirit (and its subsidiaries)

312. CommonSpirit stored and transferred this vast treasure trove of Private Information via MOVEit Transfer to Welltok, and more specifically, Welltok's MOVEit server.

313. In providing their Private Information, directly or indirectly, to Welltok and CommonSpirit (and its subsidiaries), Plaintiffs and Class Members had a reasonable expectation that this Information would be securely maintained, and not accessible to unauthorized third parties, or exfiltrated by cybercriminals.

314. Further, Plaintiffs and Class Members had a reasonable expectation that in the event of a data breach, CommonSpirit would provide timely and adequate notice to Plaintiffs and Class Members, so that Plaintiffs and Class Members could take prompt and appropriate steps to safeguard their identities.

315. By actively collecting, storing, maintaining, transferring, and profiting from Plaintiffs' and Class Members' Private Information, CommonSpirit had a duty of care to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, transferring, safeguarding, and protecting this Private Information in CommonSpirit's possession from being compromised, lost, stolen, accessed, and misused by unauthorized third parties.

316. Pursuant to this duty, CommonSpirit was required to: (i) affirmatively audit third-party software, including MOVEit Transfer, to identify vulnerabilities, monitor access to sensitive data, and discover and remediate any unauthorized data access; (ii) affirmatively vet and audit the data security practices of third-party vendors, including the vetting of Welltok's and Progress's data security practices; (iii) affirmatively implement adequate supply chain security; (iv) and provide prompt and adequate notice to those affected by a data breach of Plaintiffs' and Class Members' Private Information.

317. CommonSpirit had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiffs and Class Members would be harmed by CommonSpirit's affirmative implementation of inadequate security measures and failure to protect Private Information because hackers routinely target inadequately protected security systems the Private Information was stored therein in an attempt to steal such information and use it for nefarious purposes, CommonSpirit knew it was more likely than not that Plaintiffs and Class Members would be harmed by CommonSpirit's inadequate data security measures and the theft of their Private Information.

318. CommonSpirit also owed common law duties because its conduct created a foreseeable risk of harm to Plaintiffs and Class Members. CommonSpirit's affirmative conduct

included implementing inadequate data security measures to protect Plaintiffs' and Class Members' Private Information.

319. CommonSpirit's duty also arose from its position as healthcare provider. By collecting and maintaining Plaintiffs' and Class Members' Private Information in order to provide healthcare services, CommonSpirit has a special relationship with Plaintiffs and Class Members, and thereby assumed a duty to reasonably protect Plaintiffs' and Class Members' Private Information as CommonSpirit was in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

320. CommonSpirit had duties to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

321. CommonSpirit had a duty to use reasonable security measures under HIPAA, which required CommonSpirit to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

322. CommonSpirit's duty to act reasonably in collecting, storing, and maintaining the Private Information, and to use reasonable care in protecting such information arose not only as a result of the statutes and regulations described above, but also because CommonSpirit is bound by industry standards to protect confidential Private Information that it either affirmatively acquires, maintains, stores, utilizes, and/or transfers.

323. CommonSpirit was subject to an "independent duty," untethered to any contract between CommonSpirit and Plaintiffs or Class Members.

324. CommonSpirit affirmatively breached its duties to Plaintiffs and Class Members in numerous ways, as described herein, including by:

a. Acting unreasonably in collecting, storing, and maintaining the Private Information and failing to exercise reasonable care in its implementation of its security systems, protocols, and practices in order to sufficiently protect the Private Information of Plaintiffs and Class Members;

b. Negligently designing and maintaining its data security systems in a manner that failed secure Plaintiffs' and Class Members' Private Information from unauthorized access;

c. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

d. Inadequately auditing third-party software, including MOVEit Transfer;

e. Inadequately vetting, auditing, monitoring, or ensuring the integrity of its vendor's data security practices;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

325. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class Members was reasonably foreseeable, particularly in light of CommonSpirit's inadequate security practices.

326. It was foreseeable that CommonSpirit's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the administrative services and file transfer software industries.

327. CommonSpirit has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class Members could and would suffer if their Private Information was wrongfully disclosed.

328. Plaintiffs and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. CommonSpirit knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class Members, the critical importance of providing adequate security of that Private Information, the necessity for encrypting Private Information stored on CommonSpirit's systems, and adequately securing the encryption keys so that encrypted Private Information cannot be decrypted by unauthorized users.

329. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in one or more types of injuries Plaintiffs' and Class Members.

330. Plaintiffs and the Class Members had no ability to protect their Private Information that was in, and possibly remains in, CommonSpirit's possession.

331. CommonSpirit's duties extended to protecting Plaintiffs and the Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

332. But for CommonSpirit's wrongful and negligent breach of duties owed to Plaintiffs and the Class Members, the Private Information of Plaintiffs and the Class Members would not have been compromised.

333. There is a close causal connection between CommonSpirit's inadequately implemented security measures to protect the Private Information of Plaintiffs and the Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class Members. The Private Information of Plaintiffs and the Class Members was lost and accessed as the proximate result of CommonSpirit's failure to exercise reasonable care in safeguarding such Private Information by affirmatively adopting, implementing, and maintaining inadequate security measures.

334. The injury and harm that Plaintiffs and the other Class Members suffered was the direct and proximate result of CommonSpirit's negligence. Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Private Information; (iii) breach of the confidentiality of their Private Information; (iv) lost value of their Private Information, for which

there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks identity theft they face and will continue to face; (vi) out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud; and (vii) anxiety and emotion distress as a result of the unauthorized disclosure of their Private Information and publication on the dark web.

335. As a direct and proximate result of CommonSpirit's negligence, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, nominal, and punitive damages in an amount to be proven at trial.

336. Plaintiffs and Class Members are also entitled to injunctive relief requiring CommonSpirit to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to Plaintiffs and Class Members.

**SECOND CAUSE OF ACTION AGAINST COMMONSPIRIT**
**Negligence *per se***

337. Plaintiffs re-allege and incorporate by reference paragraphs 1-193 above.

338. Plaintiffs bring this claim against CommonSpirit on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

339. CommonSpirit's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

340. CommonSpirit's duties also arise from Section 5 of the FTCA, 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as CommonSpirit, of failing to employ reasonable measures to protect and secure Private Information.

341. CommonSpirit violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and not complying with applicable industry standards. CommonSpirit's conduct was particularly unreasonable given the nature and amount of Private Information it obtains and stores, and the foreseeable consequences of a data breach involving Private Information including, specifically, the substantial damages that would result to Plaintiffs and Class Members.

342. CommonSpirit's violations of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence *per se*.

343. Plaintiffs and Class Members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

344. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

345. It was reasonably foreseeable to CommonSpirit that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the access, compromise, and theft of Plaintiffs' and Class Members' Private Information by unauthorized individuals.

346. The injury and harm that Plaintiffs and the other Class Members suffered was the direct and proximate result of CommonSpirit's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Private Information; (iii) breach of the confidentiality of their Private Information; (iv) lost value of their Private Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks identity theft they face and will continue to face; (vi) out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud; and (vii) anxiety and emotion distress as a result of the unauthorized disclosure of their Private Information and publication on the dark web.

347. As a direct and proximate result of CommonSpirit's violation of the foregoing statutes and regulations, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, nominal, and punitive damages in an amount to be proven at trial.

348. Plaintiffs and Class Members are also entitled to injunctive relief requiring CommonSpirit to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to Welltok Bellwether Plaintiffs and all Class Members.

**THIRD CAUSE OF ACTION AGAINST COMMONSPIRIT**
**Declaratory Judgment**

349. Plaintiffs re-allege and incorporate by reference paragraphs 1-193 above.

350. Plaintiffs bring this claim against CommonSpirit on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

351. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

352. An actual controversy has arisen in the wake of the Data Breach regarding CommonSpirit's present and prospective common law and other duties to reasonably safeguard Plaintiffs' and Class Members' Private Information and whether CommonSpirit is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further, future data breaches that compromise their Private Information.

353. Plaintiffs and Class Members allege that CommonSpirit's data security measures remain inadequate, and CommonSpirit has not provided any evidence that it has remedied the failure that occurred in the Data Breach at issue or have remedied any other vulnerability from their failure to properly assess threats by cybercriminals.

354. Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

355. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. CommonSpirit continues to owe a legal duty to secure consumers' Private Information and to timely notify consumers of a data breach under the common law, the FTCA, and HIPAA;

b. CommonSpirit owes a duty by virtue of its special relationship, understanding that it is safeguarding sensitive, Private Information, or that it has already acknowledged a responsibility to keep such information safe; and

c. CommonSpirit continues to breach this legal duty by failing to employ reasonable measures to secure consumers' Private Information.

356. The Court also should issue corresponding prospective injunctive relief requiring CommonSpirit to employ adequate security protocols consistent with law and industry standards to protect consumers' Private Information.

357. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and lack an adequate legal remedy, in the event of another data breach at Welltok and/or CommonSpirit. The risk of another such breach is real, immediate, and substantial. If another breach at Welltok/CommonSpirit occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

358. The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to CommonSpirit if an injunction is issued. Among other things, if another massive data breach occurs at Welltok/CommonSpirit, Plaintiffs and Class Members will likely be subjected to substantial identify theft and other damage (as they cannot elect to store their information with another company). On the other hand, the cost to CommonSpirit of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and CommonSpirit has a pre-existing legal obligation to employ such measures.

359. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by helping to prevent another data breach at Welltok/CommonSpirit, thus eliminating the additional injuries that would result to Plaintiffs and Class Members whose Private Information would be further compromised.

**FOURTH CAUSE OF ACTION AGAINST COMMONSPIRIT**
**Violation of Massachusetts General Laws, Ch. 93A**

360. Plaintiffs re-allege and incorporate by reference paragraphs 1-193 above.

361. Plaintiffs bring this claim against CommonSpirit on behalf of the CommonSpirit Nationwide Class or, in the alternative, the CommonSpirit State Classes.

362. M.G.L. ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. ch. 93A § 9 permits any consumer injured by a violation of M.G.L. ch. 93A § 2 to bring a civil action, including a class action, for damages and injunctive relief.

363. Plaintiffs allege that CommonSpirit committed unfair business acts and/or practices in violation of M.G.L. ch. 93A §§ 2 and 9.

364. CommonSpirit knew or should have known of the inherent risks in experiencing a data breach if it failed to maintain adequate systems and processes for keeping Plaintiffs' and Class Members' Private Information safe and secure. Only CommonSpirit was in a position to ensure that its systems were sufficient to protect against harm to Plaintiffs and Class Members resulting from a data security incident such as the Data Breach; instead, CommonSpirit failed to implement such safeguards.

365. CommonSpirit's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information. CommonSpirit's misconduct included failing to

adopt, implement, and maintain the systems, policies, and procedures necessary to prevent the Data Breach.

366. CommonSpirit acknowledged that its conduct created actual harm to Plaintiffs and Class Members because Plaintiffs and Class Members were instructed to monitor their accounts for fraudulent conduct and identity theft.

367. CommonSpirit knew, or should have known of, the risks inherent in disclosing, collecting, storing, accessing, and transmitting Private Information and the importance of adequate security because of, *inter alia*, the prevalence of data breaches.

368. CommonSpirit failed to adopt, implement, and maintain fair, reasonable, or adequate security measures to safeguard Plaintiffs' and Class Members' Private Information, failed to recognize in a timely manner the Data Breach, and failed to notify Plaintiffs and Class Members in a timely manner that their Private Information was accessed in the Data Breach.

369. These acts and practices are unfair in material respects, offend public policy, are immoral, unethical, oppressive, and unscrupulous and violate 201 CMR 17.00 and M.G.L. ch. 93A § 2.

370. The injury and harm that Plaintiffs and the other Class Members suffered was the direct and proximate result of CommonSpirit's unfair acts and practices. Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Private Information; (iii) breach of the confidentiality of their Private Information; (iv) lost value of their Private Information, for which there is a well-established national and international market; (v) lost time and money incurred to

mitigate and remediate the effects of the Data Breach, including the increased risks identity theft they face and will continue to face; (vi) out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud; and (vii) anxiety and emotion distress as a result of the unauthorized disclosure of their Private Information and publication on the dark web.

371. Neither Plaintiffs nor the other Class Members contributed to the Data Breach.

372. Plaintiffs sent demands for relief, in writing, to CommonSpirit on December 1, 2025, as required by M.G.L. c. 93A § 9.

373. If CommonSpirit fails to rectify the problems associated with the actions detailed above within 30 days of the date of written notice, Plaintiffs will amend this Complaint to add claims for actual, punitive, and statutory damages, as appropriate.

374. Based on the foregoing, Plaintiffs and the Class Members are entitled to all remedies available pursuant to M.G.L ch. 93A, including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

375. Pursuant to M.G.L. ch. 231, § 6B, Plaintiffs and Class Members are further entitled to pre-judgment interest as a direct and proximate result of CommonSpirit's wrongful conduct. The amount of damages suffered as a result is a sum certain and capable of calculation and Plaintiffs and Class Members are entitled to interest in an amount according to proof.

## FIFTH CAUSE OF ACTION AGAINST COMMONSPIRIT
## Violation of the Nebraska Consumer Protection Act
## Neb. Rev. Stat. §§ 59-1601, *et seq.*

376. Plaintiffs re-allege and incorporate by reference paragraphs 1-193 above.

377. Plaintiff George brings this claim against CommonSpirit on behalf of the CommonSpirit Nebraska State Classes ("Nebraska Class Members").

378. CommonSpirit, Plaintiff George, and Nebraska Class Members are each a "person" as defined by Neb. Rev. Stat. § 59-1601(1).

379. CommonSpirit advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska, as defined by Neb. Rev. Stat. § 59-1601.

380. CommonSpirit engaged in unfair and deceptive acts and practices in conducting trade and commerce, in violation of Neb. Rev. Stat. § 59-1602, including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff George's and Nebraska Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of

Plaintiff George's and Nebraska Class Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808;

f. Failing to timely and adequately notify the Plaintiff George and Nebraska Class Members of the Data Breach;

g. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff George's and Nebraska Class Members' Private Information; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808.

381. CommonSpirit's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of CommonSpirit's data security and ability to protect the confidentiality of consumers' Private Information.

382. As a direct and proximate result of CommonSpirit's unfair and deceptive acts and practices, Plaintiff George and Nebraska Class Members have suffered and will continue to suffer

injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

383. CommonSpirit's unfair and deceptive acts and practices complained of herein affected the public interest, including the large number of Nebraskans affected by the Data Breach.

384. Plaintiff George and Nebraska Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, the greater of either (1) actual damages or (2) $1,000, civil penalties, and reasonable attorneys' fees and costs.

**SIXTH CAUSE OF ACTION AGAINST COMMONSPIRIT**
**Violation of the Nebraska Uniform Deceptive Trade Practices Act**
**Neb. Rev. Stat. §§ 87-301, *et seq.***

385. Plaintiffs re-allege and incorporate by reference paragraphs 1-193 above.

386. Plaintiff George brings this claim against CommonSpirit on behalf of the CommonSpirit Nebraska State Classes ("Nebraska Class Members").

387. CommonSpirit, Plaintiff George, and Nebraska Class Members are each a "person" as defined by Neb. Rev. Stat. § 87-301(19).

388. CommonSpirit advertised, offered, or sold goods or services in Nebraska engaged in trade or commerce directly or indirectly affecting the people of Nebraska.

389. CommonSpirit engaged in unfair and deceptive acts and practices in conducting trade and commerce, in violation of Neb. Rev. Stat. §§ 87-302(a)(5), (8), and (10), including:

a. Represented that goods and services have characteristics, uses, benefits, or qualities that they do not have;

b. Represented that goods and services are of a particular standard, quality, or

grade if they are of another; and

c. Advertised its goods and services with intent not to sell them as advertised and in a manner calculated or tending to mislead or deceive.

390. CommonSpirit's deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff George's and Nebraska Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff George's and Nebraska Class Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the

FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808;

f. Failing to timely and adequately notify the Plaintiff George and Nebraska Class Members of the Data Breach;

g. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff George's and Nebraska Class Members' Private Information; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff George's and Nebraska Class Members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and the Nebraska Data Protection Act, Neb. Rev. Stat. § 87-808.

391. CommonSpirit's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of CommonSpirit's data security and ability to protect the confidentiality of consumers' Private Information.

392. CommonSpirit intended to mislead Plaintiff George and Nebraska Class Members and induce them to rely on its misrepresentations and omissions.

393. Had CommonSpirit disclosed to Plaintiff George and Nebraska Class Members that its data systems were not secure and, thus, vulnerable to attack, CommonSpirit would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, CommonSpirit were trusted with sensitive and valuable Private Information of consumers' including Plaintiff George and Nebraska Class

Members. CommonSpirit accepted the responsibility of being a steward of this data while keeping the inadequate state of its security controls secret from the public. Accordingly, because CommonSpirit held itself out as securely maintaining the Private Information, Plaintiff George and Nebraska Class Members acted reasonably in relying on CommonSpirit's misrepresentations and omissions, the truth of which they could not have discovered.

394. CommonSpirit acted intentionally, knowingly, and maliciously to violate Nebraska's Uniform Deceptive Trade Practices Act, and recklessly Plaintiff George's and Nebraska Class Members' rights.

395. As a direct and proximate result of CommonSpirit's unfair and deceptive acts and practices, Plaintiff George and Nebraska Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

396. CommonSpirit's unfair and deceptive acts and practices complained of herein affected the public interest, including the large number of Nebraskans affected by the Data Breach.

397. Plaintiff George and Nebraska Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, civil penalties, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows

a. For an Order certifying the Class(es) under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs and Co-Lead Counsel to represent the Class(es);

b. For an Order finding in favor of Plaintiffs and the Class(es) on all causes of action asserted herein;

c. For damages in an amount to be determined by the trier of fact;

d. For an order of restitution and all other forms of equitable monetary relief;

e. Declaratory and injunctive relief as described herein;

f. Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

g. Awarding pre- and post-judgment interest on any amounts awarded; and

h. Awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Date: December 1, 2025

Respectfully Submitted,

*/s/ Gary F. Lynch*

Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
gary@lcllp.com

E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler Street, NE, Suite 205
Minneapolis, MN 55413
Tel: (612) 594-5933
Fax: (612) 584-4470
emdrake@bm.net

Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
Tel: (202) 408-4600
dmcnamara@cohenmilstein.com

Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 612-339-0981
khriebel@locklaw.com

Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663
cshaffer@lfsblaw.com

*Plaintiffs' Lead Counsel*

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, LPA
4445 Lake Forest Drive, Suite 490
Cincinnati, OH 45242
Phone: (513) 345-8291
Fax: (513) 345-8294
jgoldenberg@gs-legal.com

*Additional Counsel for Plaintiff George*

M. Anderson Berry
Brook E. Garberding
Gregory Haroutunian
Emery | Reddy, PC
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106
Fax: (206) 441-9711
anderson@emeryreddy.com
brook@emeryreddy.com
gregory@emeryreddy.com

*Additional Counsel for Plaintiff McClendon*